UNITED STATES, Appellee

v

BOBBY G. SIMPSON, Technical Sergeant,
U. S. Air Force, Appellant

10 USCMA 229, 27 CMR 303

*Captain Norman K. Hogue* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Sam F. Carter, Lieutenant Colonel Ellis L. Gottlieb,* and *Major Donald C. Helling.*

*Lieutenant Colonel James R. Thorn* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Robert W. Michels.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

This is an appeal from a conviction by a general court-martial. Two assignments of error are presented for our consideration. Both concern the sentence.

We consider first the legality of part of the sentence action taken by the convening authority. The accused, an Air Force Technical Sergeant, was convicted of three specifications of larceny by check, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. After receiving extensive evidence in mitigation, the court-martial sentenced him to be discharged from the service with a bad-conduct discharge. The convening authority approved the findings and the sentence. However, he suspended execution of the discharge until September 1, 1958, with provision for remission. He also directed that the accused be reduced to Airman First Class unless the suspension of the discharge was vacated, "in which event, the accused, at that time, will be reduced to the lowest enlisted grade without further action." The accused challenges the reduction in rank imposed by the convening authority as an illegal increase in the sentence adjudged by the court-martial. On the other hand, the Government contends the reduction is justified by a provision in the Manual for Courts-Martial, United States, 1951, and Air Force regulations promulgated thereunder.

The starting point for our discussion is paragraph 126e of the Manual for Courts-Martial, supra, as amended by Executive Order No. 10652, January 10, 1956, 21 FR 235. In its amended form, the paragraph reads as follows:

"Unless otherwise prescribed in regulations promulgated by the Secretary of the Department concerned, in the case of an enlisted person of other than the lowest pay grade, a court-martial sentence which, as approved by the convening authority, includes: (1) dishonorable or bad-conduct discharge, whether or not suspended, (2) confinement, or (3) hard labor without confinement, immediately, upon being so approved, shall reduce such enlisted person to the lowest enlisted pay grade; provided, that the rate of pay of the person so reduced shall be commensurate with his cumulative service; and provided further, that any person so reduced shall have all rights, privileges, and property affected by such reduction restored if the sentence is subsequently set aside or disapproved, or if the sentence as finally approved does not contain any of the elements listed above.

"A court-martial is authorized to sentence an enlisted person to be reduced to an inferior or intermediate grade."

Under supplementary Air Force regulations, the convening authority is authorized to retain the accused in the grade he is in at the time of trial or in an intermediate grade if the sentence adjudged by the court-martial "does not expressly provide for reduction to basic airman" and the discharge and confinement portions of the

sentence are suspended. AFR 111–15, March 18, 1957.

In United States v Flood, 2 USCMA 114, 6 CMR 114, we noted that there is a basic conflict between the first and second parts of the quoted portions of paragraph 126e. Indeed, if reduction to the lowest enlisted grade is automatic, as the first part of the paragraph indicates, it is meaningless in most cases to say that the court-martial is "authorized to sentence an enlisted person to be reduced to an inferior or intermediate grade." We held that the Manual intended to indicate a court-martial could reduce an accused to an intermediate rather than to the lowest enlisted grade. This holding, of course, is consonant with the Uniform Code provisions to the effect that courts-martial may adjudge any sentence "not forbidden" by law and within the maximum limitations prescribed by the President. Articles 18, 19, 20, Uniform Code of Military Justice, 10 USC §§ 818, 819, 820. United States v Stiles, 9 USCMA 384, 26 CMR 164. We went on, in the *Flood* case, to consider the relation between the automatic reduction provision and the supplementary Navy regulation on the subject. Our discussion was based on the assumption that the Manual provision was consistent with the Uniform Code. That assumption is now specifically questioned. United States v Choate, 9 USCMA 680, 682, 26 CMR 681, footnote 1.

The Government contends that no enlisted member of the armed forces has any "vested property right in any particular grade, rate, or rank." It contends that the President, as Commander-in-Chief of the armed forces, has unrestrained powers to "prescribe . . . for how long, an enlisted member . . . may hold any given grade, rate, or rank." It argues that the President can, as "a consequence" of a particular sentence by a court-martial, reduce an enlisted person, whatever his former grade or rank, to the lowest enlisted grade. Such action, it maintains, is purely *administrative* in nature and outside the judicial operation of the courts-martial system. See

**232**

United States v Gardner, ACM S–17239, October 8, 1958.

We do not desire, nor are we required, to examine the President's administrative power to reduce enlisted persons in the armed forces. Our only concern is with judicial acts in the course of court-martial proceedings. Article 67, Uniform Code of Military Justice, 10 USC § 867. We have already pointed out that reduction in grade of an enlisted person is not forbidden by the Uniform Code and is expressly recognized as permissible punishment by the Manual for Courts-Martial, supra. Consequently, it is within the sound discretion of the court-martial to include a proper reduction to an inferior grade in its sentence. Once finally announced, the adjudged sentence cannot thereafter be increased by either the court-martial or by a reviewing authority. See United States v Castner, 3 USCMA 466, 13 CMR 22.

As we construe the Manual provision, it is intended to be an integral part of the review of a sentence adjudged by a court-martial. Executive Order No. 10214, February 8, 1951, 16 FR 1303, which prescribes the Manual, specifically says it applies "to all court-martial processes." Manual for Courts-Martial, supra, page IX. The reduction provision itself is included within the discussion of punishments which may be imposed by courts-martial. The provision is so interwoven with the courts-martial process that it cannot be regarded as anything but judicial in purpose and effect. As a judicial act, it operates improperly to increase the severity of the sentence of the court-martial. We conclude, therefore, that the provision is invalid. Accordingly, the action by the convening authority reducing the accused in grade must be set aside.

The second error relates to certain comments by trial counsel in connection with the sentence. This was a rehearing. The maximum sentence that could be adjudged was that imposed at the previous trial, namely,

bad-conduct discharge and confinement at hard labor for six months. Trial counsel observed that the period of confinement was small and had virtually expired. Consequently, he urged the court-martial to impose a bad-conduct discharge. He asked the court to consider that "any discharge from the service, other than a dishonorable discharge, may be . . . wiped off the record" by the board for correction of military records in Washington. Individual defense counsel objected to the statement; he argued that only the court could, and should, pass sentence, and only on the basis of the evidence it had heard. In reply, trial counsel said that he "concur [red] with the defense counsel," but still he went on to say that even if the court adjudged a bad-conduct discharge, "it is not a permanent blot" on the accused's character. Again defense counsel objected. On neither occasion did the law officer pass on the objection or advise the court-martial on the effect of trial counsel's remarks.

The board of review considered the accused's allegation of error and concluded that, in context, ■■■■■■■ ■ trial counsel's remarks did not exceed the bounds of fair comment. In our opinion, it was highly improper for trial counsel to refer to possible ameliorative action by an administrative agency. Considered as a whole, his argument presents a fair risk of improperly influencing the sentence deliberations of the court-martial. There was no cautionary instruction by the law officer, and we cannot therefore conclude that the effect of the remarks was eliminated.

The decision of the board of review as to the sentence is reversed. A rehearing on the sentence may be ordered.

Judge FERGUSON concurs.

LATIMER, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

I agree generally with the treatment accorded the second issue in the principal opinion. As I noted in my dissent in United States v Story, 10 USCMA 145, 27 CMR 219, "The time is long past when military courts should give an excessive sentence in reliance on higher headquarters adjusting the inequities," and, while it cannot be stated categorically that the sentence in the present case was excessive, there remains a fair possibility that accused was prejudiced by the improper remarks of trial counsel.

With regard to my associates' discussion of the first issue, however, I must take vigorous exception, for it is inconceivable to me they at this late date would overturn such a well-established principle. Even though it seeks to skirt the periphery of the administrative powers of the President in his capacity as Commander-in-Chief of the armed forces, the opinion cuts directly through the heart of one and devitalizes many. Moreover, while it categorically states that the Presidential order cannot be regarded as anything but judicial in purpose and effect, to reach that result the decision repudiates with understandable silence the following legal concepts: (1) That statutes and regulations having the force of statutes should, if reasonably possible, be construed to give validity to both; (2) words and phrases used in legislative enactments should be interpreted according to their ordinary meaning; (3) if permissible within the plain meaning of the words and phrases used, a court should construe a law or a regulation having the force of law to be valid; (4) the President has been delegated the power by the Constitution to make rules and regulations to maintain order and discipline in the armed services and courts should not invalidate reasonable orders which he issues to effectuate that purpose; (5) penalties resulting by operation of law are not part of a sentence; and (6) the legality of a Presidential order is not determined by its place of publication. Finally, as an anticlimax to my preliminary comments, I mention that this decision overrules sub silentio numerous previous decisions published by us, and it may proliferate litigation by those who have been reduced under our prior holdings that the questioned Manual provision was valid.

**233**

My purpose is to apply the legal principles outlined above and when I do, I reach a result contrary to my associates. The first part of my discussion will cover generally the first three of these maxims, and as a starting point, I consider it advisable to determine the nature and efficacy of a Presidential proclamation or order. In the Constitution of the United States of America, 1952, page 481, prepared by the Legislative Reference Service, Library of Congress, Edward S. Corwin, Editor, I find the following statement:

"THE PRESIDENT AS LAW INTERPRETER

"The power accruing to the President from his function of law interpretation preparatory to law enforcement is daily illustrated in relation to such statutes as the Anti-Trust Acts, the Taft-Hartley Act, the Internal Security Act, and many lesser statutes. Nor is ·this the whole story. Not only do all Presidential regulations *and orders* based on statutes which vest power in him or on his own constitutional powers have the force of law, provided they do not transgress the Court's reading of such statutes or of the Constitution, but he sometimes makes law in a more special sense." [Emphasis supplied.]

In Smith v Whitney, 116 US 167 29 L ed 601, 6 S Ct 570, the Supreme Court had this to say:

"By section 1547 of the Revised Statutes, passed since the adoption of the Navy Regulations of 1870, 'the orders, regulations and instructions issued by the Secretary of the Navy prior to July 14, 1862, with such alterations as he may since have adopted, with the approval of the President, shall be recognized as the Regulations of the Navy, subject to alterations adopted in the same manner.' This legislative recognition of the Navy Regulations of 1870 'must,' as was said by *Chief Justice* Marshall of a similar recognition of the Army Regulations in the Act of April 24, 1816, chap. 69, § 9, 3 Stat. at L. 298,

'be understood as giving to these regulations the sanction of the law.' "

Again in The United States v Eliason, 16 Pet 291 (US 1842), the same Court states:

"The Secretary of War is the regular constitutional organ of the President for the administration of the military establishment of the nation, and rules and orders publicly promulgated through him must be received as the acts of the executive, and as such, be binding upon all within the sphere of his legal and constitutional authority.

"Such regulations cannot be questioned or defined, because they may be thought unwise or mistaken."

Not only has the highest tribunal in the Judicial branch of our Government given the force of law to Presidential or service orders or regulations, but I think it is quite obvious Congress itself gives the same authority, dignity and effect to them, for in Article 92 of the Code it specifically proscribes their violation without limit as to the punishment which may be imposed, except, of course, that it did not expressly permit the death penalty. Usually a person has to violate a law of some importance before he can be sentenced to a substantial period of confinement, and had Congress not deemed Army, Air Force, or Navy regulations equivalent to statutes, I feel reasonably certain it would not have permitted imposition of confinement for two years, which renders the offense a felony. Therefore, if I equate Executive orders and service regulations to statutes, I am in good company with the Supreme Court and the Congress.

Accepting the premise that Presidential proclamations have the force and effect of law, I move on to consider the rule by which they should be interpreted. As a starting point, I note that if there is an irreconcilable conflict, the Code is paramount. However, I think all courts try to give effect to the maxim that consistency of laws dealing with the same subject is of

234

primary importance and, in the absence of a showing to the contrary, they are presumed to be consistent with each other. Certainly, where it is possible to do so, it is the duty of a court, in construing statutes, to harmonize and reconcile them, and to adopt an interpretation which will accomplish that effect.

I believe in numerous cases we have said that much. I shall mention but two. In the early case of United States v Lucas, 1 USCMA 19, 1 CMR 19, we made this significant comment:

> "For the purposes of this case we can and do hold that the act of Congress (the Code) and the act of the Executive (the Manual) are on the same level and that the ordinary rules of statutory construction apply. In that event the general rule is that statutes dealing with the same subject should, if possible, be so construed that effect is given to every provision of each. Moreover, in dealing with each, its provisions should be construed so that no part will be inoperative, superfluous, void or ineffective."

And in United States v Brasher, 2 USCMA 50, 6 CMR 50, the Chief Judge concurred with Judge Brosman in this pronouncement:

> "It is to be observed at the outset that the limitation under scrutiny here is not the subject of express provision in the Uniform Code of Military Justice, but is entirely a creature of the Manual for Courts-Martial. However, we have held that, in the absence of inconsistency, the Act of Congress—the Uniform Code—and the act of the Executive—the Manual for Courts-Martial—function on the same authoritative level, and that the usual rules of statutory interpretation apply. United States v Lucas (No. 7), 1 USCMA 19, 1 CMR 19, decided November 8, 1951. We conclude, therefore, that certainly, so far as courts-martial and convening authorities are concerned, the six month limitation is a part of that body of law applied and enforced by this Court."

A reading of the original Executive proclamation and its successors convinces me that if I give to ▮ the language of the order its ordinary meaning, there is no hostility with the Code. Even assuming the President should be limited solely to regulating in an administrative field, this order is in concord with the statutory law. For convenience of the reader, I quote the one now in effect:

> "Unless otherwise prescribed in regulations promulgated by the Secretary of the Department concerned, in the case of an enlisted person of other than the lowest pay grade, a court-martial sentence which, as approved by the convening authority, includes: (1) dishonorable or bad-conduct discharge, whether or not suspended, (2) confinement, or (3) hard labor without confinement, immediately, upon being so approved, shall reduce such enlisted person to the lowest enlisted pay grade; provided, that the rate of pay of the person so reduced shall be commensurate with his cumulative service; and provided further, that any person so reduced shall have all rights, privileges, and property affected by such reduction restored if the sentence is subsequently set aside or disapproved, or if the sentence as finally approved does not contain any of the elements listed above." [Executive Order No. 10652, January 10, 1956, 21 FR 235.]

It will be noticed that it makes no mention of the reduction being a component part of the sentence, and it gives to the various Secretaries of the services the authority to make it effective or noneffective. And, as a matter of information, the Secretaries of the Navy and Air Force have exercised their discretion to limit its use and in the case at bar the accused was the beneficiary of the Air Force modification. Moreover, the reduction is not a fixed ingredient of a sentence, for it may never come to pass and, if it does, it cannot take effect until the action of reviewing authorities has been taken. In some instances, the effective date might be only a few days after sentence has been announced, but

in other cases it might be months. In the Army, the date of effect is determined by the act of the convening authority; in the Navy, it may be contingent on the date the punitive discharge can be executed; and in the Air Force, it is controlled by the action taken by reviewing authorities.

Only in those instances where a Secretary of a service has made the reduction nonautomatic and required that it be included in a sentence is it of any concern of the court-martial and if granting an additional right to an accused, such as permitting reviewing authorities the power to bar a reduction as a matter of clemency, is a judicial act—which I do not concede—then I say the Secretary can legally perform judicial functions. But by any stretch of the imagination this particular provision does no more than make the rank held by an enlisted person in the armed service depend upon the final outcome of criminal litigation. It is a consequence flowing from an affirmed sentence of a stated severity, and it may or may not follow as a matter of course, depending on the discretion of a service Secretary. When construed in the light of its wording, the purposes to be accomplished, the manner in which the privilege can be bestowed or taken away, the intent of the President as expressed in the order, and the contemporaneous construction put on it by members of the Executive Department and our previous decisions, I am satisfied it is reasonable to interpret the order as not demanding the assessment of punishment which can be imposed only by a judicial tribunal.

That this type of order assessed a sanction which is administratively imposed has long been recognized. While we are not concerned with dismissal in the case at bar, the rationale of the following quotation from Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, pages 736, 737, applies with equal cogency to reduction in grade:

"The two modes of discharge or dismissal of officers specified in the Article are quite distinct in their nature. A dismissal imposed by sentence of court-martial, (or in commutation thereof,) is a *punishment*—a penalty incurred by law upon a conviction of a criminal offence. A dismissal or discharge ordered by the President in the first instance, on the contrary, is not a punishment but a *removal from office*. 'A penalty,' says Attorney General Cushing, 'is the result of a legal process. Dismissal from office belongs to a different class of administrative or political considerations, resting in the mere executive discretion of the President.'"

And the underlying concept is clarified in this paragraph from Winthrop:

"THE SENTENCE SHOULD NOT EMBRACE PENALTIES RESULTING BY OPERATION OF LAW. Thus the sentence of a deserter need not and should not contain a direction to the effect that he make good the time lost by his unauthorized absence, or that he incur the forfeitures specified in the Army Regulations, or that he be subjected to the loss of civil rights prescribed by the statute law; the same being all penal consequences attaching upon the (approved) conviction, independently of the sentence. So, in convicting an officer under Art. 6 or Art. 14, (providing for the punishment of false musters, &c.,) it is not essential to add, in connection with the dismissal to be adjudged, that the accused be disabled from holding office or employment in the public service, since this disability must necessarily result from the judgment of the court." [Winthrop's Military Law and Precedents, supra, page 405, citations omitted.]

Like the employment disability mentioned in the paragraph last quoted above, the automatic reduction provision contained in the Manual, supra, is a necessary result of the court's sentence, but nevertheless an element separate and distinct from it. Being administrative in nature it could not, as my associates contend, operate to increase unlawfully the severity of the sentence.

In my foregoing discussion I have referred to our previous cases, and I have in mind the following. In United States v Flood, 2 USCMA 114, 6 CMR 114, the Court placed its imprimatur on the provision found in the Naval Supplement to the Manual for Courts-Martial, United States, 1951, which modified the Presidential order, and held that any sentence in contravention of the Secretary of the Navy's regulation was illegal. In United States v Castner, 3 USCMA 466, 13 CMR 22, the Court again approved the rule set out in the Naval Supplement. Had either the Presidential order or the one promulgated by the Secretary of the Navy been considered as inconsistent with the Code, our discussions in those cases would have been unnecessary. Furthermore, in United States v Prescott, 2 USCMA 122, 6 CMR 122, the Court went much further in harmonizing apparent conflicts between the Code and the Manual, for there we held a provision of the latter increasing punishment was not in violation of the former. In an opinion authored by the Chief Judge, I find the following statement:

". . . The President, pursuant to the power vested in him by the Congress, prescribed and promulgated the Manual for Courts-Martial, United States, 1951, including Paragraph 127 which prescribes limitations of punishment. This action on the part of The President of the United States constituted an exercise of the executive authority granted to him by Congress (Uniform Code of Military Justice, Article 56, 50 USC § 637). An examination of the legislative history of the Uniform Code of Military Justice establishes that it was the intention of Congress to give to The President authority to fix any punishment for an offense or offenses unless such punishment was in conflict with an act of Congress. See pages 1087–1089 of the hearings before the Armed Services Committee, House of Representatives, on HR 2498, 81st Congress, 1st Session. Articles 18–20, inclusive, Uniform Code of Military Justice, 50 USC §§ 578–580, specifically authorize The President to prescribe the limitations on punishment that general courts-martial, special courts-martial, and summary courts-martial may adjudge, if not otherwise forbidden by the Code. The statutory authority expressed in these articles is exclusive of the authority delegated to The President in Article 56, supra.

"The prescribed punishments in these paragraphs are not new or foreign to the customs and traditions of the several military departments. Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 387; Section B, Paragraph 104, Manual for Courts-Martial, US Army, 1928; Section B, Paragraph 117c, Manual for Courts-Martial, US Army and US Air Force, 1949. We conclude, therefore, that the power to increase punishment, given by the Uniform Code to the Chief Executive, is not an illegal delegation of legislative authority by the Congress. Further, Paragraph 127 does not represent an unreasonable or arbitrary exercise of executive power and is in no sense the creation of an habitual criminal statute."

From all of the foregoing, I conclude there is no real inconsistency between the Code and the Manual provision now under fire and that we have repeatedly so held. I am, therefore, forced to wonder why my associates now abandon in such cavalier manner those authorities and find invalid a provision which we have previously held valid. There may be instances when a court should ignore the doctrine of stare decisis but, if so, this is not one. Undoubtedly, thousands of servicemen have been reduced pursuant to the authority of this order since it was affirmed by us, and now we say the President never possessed the power to so decree. That is instability at its worst.

For the purposes of this part of my discussion, I am willing to assume the Presidential order enters the judicial field, but that does not make it invalid. While I concede that recently the Ex-

**237**

ecutive Order (Manual) and our previous decisions upholding the validity of many of its provisions have received rather rough treatment at the hands of my associates, other courts have not been so harsh. They have invariably given the acts of the Executive the dignity of laws and sought to uphold their validity. So far as my research has extended, I have yet to find a Federal court which has doubted the authority of the President to establish reasonable rules and regulations for improving discipline and good order in the military services. And, of course, to say that the regulation under question or some other Executive order falls outside the scope of his power because it is judicial in nature and that the President cannot perform judicial functions is to preach false doctrines, for the Code, rudimentary law, and decisions of the Supreme Court show to the contrary. At the present time, Article 71(a) of the Code, 10 USC § 871, provides that a sentence of death or one involving a general or flag officer shall not be executed until affirmed by the President. In considering the 65th Article of War in effect in 1871, which required approval of the President before a sentence of dismissal could be executed, the Supreme Court in United States v Page, 137 US 673, 34 L ed 828, 11 S Ct 219, very significantly stated, "Undoubtedly the action required of the President under this article is judicial action. He decides personally, and the judgment is his own personal judgment, and not an official act presumptively his." But that is not the only time he sheds his Executive robe. At this point, it might be well to inquire regarding the nature of his actions when he reviews a record as convening authority, prescribes modes of procedure for military courts, dismisses an officer in time of war, or fixes the maximum sentence which can be imposed for any offense. The questions merely point up my belief that his powers as Commander-in-Chief embrace all three fields and are not determined by a strictly separated three-department measuring rod.

I have not overlooked the argument that he has been granted those powers by Congress, and that the question is therefore inappropriate. The answer to this assertion is that historically it has not always been that way but, more important, he has been given certain powers by the Constitution as Commander-in-Chief and, when operating under that grant of power or even under a legislative grant, he is not limited by the fine niceties differentiating the three Departments of the Government. Those departments are not necessarily disjointed, as they are partly interacting and, when I give consideration to the traditional way in which the Legislative Department and the Executive Department have jointly collaborated to govern the armed forces, I find a recognition by Congress that the Chief Executive may invade the sentence field and make regulations even though in so doing he does not stay strictly within the tripartite distribution of power. In short, in that field which may involve executive, judicial, and legislative functions, we have a systematic, unbroken executive practice, pursued for over the entire life of this country with the knowledge and blessing of Congress, and never up to this date legally questioned by that body. Why, then, should we be so hypertechnical about departmentalizing his functions to deny him powers which have been continuously recognized?

I believe it fair to assume that in no other branch of the Government do the powers and duties of Congress and the President overlap to the extent they do in the military departments. Over the years, both have joined to form the complex of military law as it exists today. That makes all the more relevant the doctrine contained in a brief filed by Mr. John W. Davis when he was Solicitor General, and quoted in Youngstown Sheet & Tube Co. v Sawyer, 343 US 579, 689, 72 S Ct 863, 96 L ed 1153 (1952). Because of its clarity, logic, and relevancy to our problem, I quote this part:

"'Ours is a self-sufficient Government within its sphere. (Ex parte Siebold, 100 US 371, 395 [25 L ed 717]; In re Debs, 158 US 564, 578 [15 S Ct 900, 39 L ed 1092].) "Its means are adequate to its ends"

(McCulloch v [State of] Maryland, 4 Wheat 316, 324 [US 1819], and it is rational to assume that its active forces will be found equal in most things to the emergencies that confront it. While perfect flexibility is not to be expected in a Government of divided powers, and while division of power is one of the principal features of the Constitution, it is the plain duty of those who are called upon to draw the dividing lines to ascertain the essential, recognize the practical, and avoid a slavish formalism which can only serve to ossify the Government and reduce its efficiency without any compensating good. The function of making laws is peculiar to Congress, and the Executive can not exercise that function to any degree. But this is not to say that all of the *subjects* concerning which laws might be made are perforce removed from the possibility of Executive influence. The Executive may act upon things and upon men in many relations which have not, though they might have, been actually regulated by Congress. In other words, just as there are fields which are peculiar to Congress and fields which are peculiar to the Executive, so there are fields which are common to both, in the sense that the Executive may move within them until they shall have been occupied by legislative action. These are not the fields of legislative prerogative, but fields within which the lawmaking power may enter and dominate whenever it chooses. This situation results from the fact that the President is the active agent, not of Congress, but of the Nation. As such he performs the duties which the Constitution lays upon him immediately, and as such, also, he executes the laws and regulations adopted by Congress. He is the agent of the people of the United States, deriving all his powers from them and responsible directly to them.' "

The net of my foregoing comments leads me to the inescapable conclusion that this Court should not be searching for ways and means to cast aside Executive orders which have a direct im-

pact on military order and discipline on refined distinctions between legislative, judicial, and executive functions. One would surely be undiscerning not to know that Congress is unable to legislate on all the details necessary to maintain a well-disciplined armed force. A great deal must necessarily be left to the judgment of the Commander-in-Chief and, while the powers and duties should be marked by Congressional guideposts, within the marked boundaries he should be given wide latitude. If there ever was a field which has been common to the Executive and Legislative Departments, it is the area of sentence in military law. Times without number, Congress has invited the Executive to act in that area, and surely it is a begrudging interpretation which holds he cannot fill in the interstices which are untouched by legislation. Even though I stand alone, I prefer to take the view that in prescribing for automatic reduction, the President was functioning within the powers expressly or impliedly granted to him by either the Constitution or Congress regardless of the cloak he wore.

While it may be unnecessary for me to question the wisdom of the order, I encounter little difficulty █ in defending it as reasonable. One of the President's primary duties is to ensure order and discipline in the armed services. A reasonable order which directly or incidentally has for its purpose the accomplishment of that objective should be presumed legal. Here the order involved is rooted in the necessity of maintaining a military community where those of lesser rank respect those in authority to command. Officers and noncommissioned officers are necessarily the leaders of men in battle, and when disrespect and lack of confidence in the integrity of those in authority are prevalent, disorder is rampant. Long-established usages and customs of the services may, and ofttimes do, ripen into law, and many of our present-day regulations are no more than a written collection of words which frame up concepts which experience has proved necessary to the successful

prosecution of war. Two well-known and long-used principles underly this Executive order. First, the person who occupies the office with authority to set the standards for promotion of enlisted men has the corresponding power to prescribe the conditions for reduction. Second, to permit a noncommissioned officer who is sentenced to hard labor, confinement, or a punitive discharge, to retain his rank is degrading to the office and detrimental to discipline and good order. The latter concept is well stated by Colonel Winthrop in his Military Law and Precedents, supra, page 431. He there stated:

> "As has already been remarked,— when a term of imprisonment is adjudged a non-commissioned officer, the sentence should also embrace reduction. This for the reason assigned by the authorities, that to retain the sergeant or corporal under the circumstances in his rank must tend to degrade the same and detract from the respect due to it, and that therefore, when thus punished, he should be punished as a private soldier. In such a case also the sentence should properly be so worded as to require or allow the reduction to take effect before the imprisonment is entered upon."

Therefore, to say the order issued by the President is unreasonable, that it falls without the scope of his power as Commander-in-Chief, or that it is not necessary to maintain order and discipline in the service is to ignore the experiences encountered and the lessons learned by those who have guided the soldiers, sailors, marines, and airmen since our country became a nation. Accordingly, if, as I contend, this order has a direct bearing on the efficiency, order, and discipline of our armed citizens, it should remain untouched by even a suspicion of doubt. If we can interfere in this field, there is no limit beyond which we cannot go. Hypothetically, I suppose that, under the rule of the Court, a regulation which bars an enlisted man convicted of an offense from attending an officer candidate school can now be questioned. It is "punitive" in nature, and the "penalty" is imposed as a consequence

of a court-martial conviction. While, of course, I do not believe my brothers have such a notion, the concept they announce will support the ridiculous hypothesis.

My associates use one other reed to support their conclusion, but it is indeed weak. In holding that the reduction provision is a judicial act of the President, they cite President Truman's order prescribing the Manual as being effective on May 31, 1951, and the fact that this provision has been incorporated in paragraph 126 of the Manual for Courts-Martial, United States, 1951. Partially, at least, upon these facts they conclude, "The provision is so interwoven with the courts-martial process that it cannot be regarded as anything but judicial in purpose and effect." I find this reasoning quite unsatisfactory.

Executive Order No. 10214 prescribing the 1951 Manual states that it shall apply "to all court-martial processes." The order by reason of its very nature had to be couched in broad terms to give the Manual provisions force and effect, and I cannot agree that, as a result, everything contained therein automatically became an integral part of the military judicial process. Consider the provisions in paragraph 2 of the Manual delegating to the Secretaries of the Departments the authority to promulgate regulations for the governance of courts of inquiry. By their very nature, courts of inquiry are not a part of the court-martial process and frequently are concerned with matters of a noncriminal nature —this notwithstanding the quoted phrase in the Executive Order. Consider further the discussion on habeas corpus which is inapplicable to military law or military courts, and the inclusion of the law dealing with Divine Service, Reverent Behavior, Removal of Civil Suits, and many other matters which are in no way connected with military law, and the conclusion is inescapable that publication in the Manual cannot be used as a makeweight to bolster the conclusion of the Court. The law requires that Executive Orders be published in the Fed-

eral Register and whether they are published in other places depends upon their utility to those using the publication. And whether administrative and judicial matters are printed in the same book depends upon the compiler. The combination may be simply a matter of convenience. The Navy rule is published in a Naval Supplement, and the Air Force principle is found in Air Force regulations, but that does not add to or detract from the power of the President to promulgate rules and regulations. Pretermitting the notice required by statute, his authority is not contingent upon the means used to disseminate his proclamation.

Obviously, it was desirable that the reduction provision of paragraph 126e be published in some form readily available to military personnel and, because of the relation it bore to courts-martial sentences, its inclusion within the section of the Manual devoted to punishments was entirely fitting and proper. To argue from that incorporation that the reduction provision is essentially punitive and judicial is to give to the framers of the Manual the power to change the nature of a Presidential order. In that connection, could it be argued that, had the provision not been published in the Manual, the provision would have been nonjudicial? And, as a matter of interest, if inclusion has any importance, Chapter XXVI is captioned Non-Judicial Punishment, and the whole thrust of that section is away from the judicial processes. Does incorporation of a discussion on that punishment render it judicial?

Finally, as I interpret the majority opinion, this accused is bound to suffer. Here the convening authority exercised his power to prevent the automatic reduction to the lowest pay grade. He authorized only reduction to an intermediate grade. If administratively this accused can be reduced to a basic airman, the beneficial effect of the convening authority's action will go for naught.

For the foregoing reasons I do not join outright with my brothers.