UNITED STATES, Appellee

v

HERMAN R. PENN, Airman Basic,
U. S. Air Force, Appellant

18 USCMA 194, 39 CMR 194

No. 21,216

March 21, 1969

*Lieutenant Colonel Bertram Jacobson* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph E. Krysakowski* and *Colnel Dwight R. Rowland.*

*Major Donald B. Strickland* argued the cause for Appellee, United States. With him on the brief was *Colonel James R. Thorn.*

## Opinion of the Court

QUINN, Chief Judge:

This case involves important questions as to the relationship between civilian and military criminal investigations and the procedural requirements of each, as defined in recent cases by the Supreme Court of the United States and this Court, which control the admission into evidence of information obtained from an accused in the course of interrogation.

During the night of December 16, 1966, Airman First Class William G. Hoyer and his roommate, Airman First Class Ralph L. Welling, had their respective wallets stolen from their

quarters at McChord Air Force Base, Washington. In the months that followed, paychecks, issued to the airmen stationed at the base, were stolen at various times from mail boxes in a consolidated mail room used by the accused. About mid-February 1967, the accused cashed one of the stolen checks at a J. C. Penney Store in Tacoma, Washington. The transaction was recorded on a photographic device known as a Regiscope, which took a picture of the accused and the check. The check had been issued in the amount of $65.71, but when presented by the accused, the amount had been raised to $265.71. The accused received cash in the latter amount. At other times, a person using Hoyer's name and identification cashed several other checks that had been altered to increase the face amount. Two of the checks were cashed by banks in the City of Tacoma. Eventually, other banks were "alerted." On May 9, 1967, the accused presented a United States Treasury check in the face amount of $946.44, to a teller at the South Tacoma Branch of the Bank of Tacoma. The check was drawn to order of William A. M. Hill, Jr., an airman at the base. It was endorsed in the name of William G. Hoyer. This check had been issued in the amount of $46.44. The teller was suspicious of the check and consulted her superior, who determined not to cash it. The accused was so informed, and he left with the check. He was watched as he entered a car and drove away. The license number of the car was noted and this, along with a description of the vehicle and the accused, was passed to the United States Secret Service Office at Seattle.

By this time, three Government investigative agencies were involved in the case. Hoyer and Welling had reported the loss of their wallets to the Air Police; a Postal Investigator was apparently investigating the mail thefts; and the Seattle Office of the Secret Service had assigned Special Agent Wallace A. Primrose to investigate the alteration of the Government checks. When the report on the Bank of Tacoma incident came in, Agent Primrose had recovered at least one of the stolen pay checks from the Federal Reserve system. This check had been altered by changing the amount of $47.77 to $947.77, and it, too, was endorsed in the name of "William G. Hoyer." Inquiry at the Washington Motor Vehicle License Division revealed that the vehicle used by the person involved in the Bank of Tacoma attempt was registered to Clarence C. Pinckney, an airman stationed at McChord Air Force Base. Primrose communicated with Special Agent L. L. Lohmeier of the Office of Special Investigations at McChord. What followed is important to this appeal, but for the present it is sufficient to note that the investigation by Lohmeier and OSI Agent Francis M. Mazurkiewicz resulted in the discovery of a number of United States Treasury checks in the car, including the one presented to the Bank of Tacoma, and identification cards stolen from Hoyer and Welling were discovered in the accused's locker. Later, Secret Service Agent Primrose interviewed the accused at the base. He obtained two samples of handwriting from him. Over a period of time, he obtained three other handwriting exemplars composed by the accused in his presence.

At trial, the exemplars were offered in evidence to provide the foundation for testimony by a Treasury Department document analyst calculated to identify the accused as the author of endorsements on a number of forged checks. Defense counsel attempted to inquire into the extent to which the accused had been advised of his rights before he furnished the exemplars, but trial counsel resisted the effort on the ground that the matter of threshold advice was "irrelevant" because Agent Primrose was engaged in a Secret Service investigation, and Federal civilian law did not require him to provide such advice in connection with the procurement of handwriting samples from an accused.[1] The law officer ruled that Primrose had no "ob-

---

[1] In part, trial counsel's argument was as follows:

"The reason that the reading of rights in respect to the securing of

ligation" to advise the accused of "his rights under either the Fifth Amendment or Article 31 prior to obtaining the exemplars," and the handwriting exemplars were admitted in evidence.

Before we consider the specific problems raised by the appeal, we are constrained to point out that ▉ the circumstances under which evidence is obtained from an accused are relevant to admissibility at trial. A police officer may have authority to perform a particular act, but the manner in which he performs that act may exceed limits allowed by law and thereby taint the whole of what he does. Kremen v United States, 353 US 346, 1 L Ed 2d 876, 77 S Ct 828 (1957); Rochin v California, 342 US 165, 96 L Ed 183, 72 S Ct 205 (1952). Evidence that the accused had, or had not, been advised of his rights in a criminal investigation is, therefore, relevant to whether exemplars of his handwriting are admissible. The record of the Article 32 investigation contains two Secret Service forms captioned, "WARNING AND CONSENT TO SPEAK," which recite the right to remain silent and the right to counsel; both forms bear the signature of the accused and a certificate by Agent Primrose indicating he had orally advised the accused of the rights recited in the forms before the accused signed them. Had such evidence been received at trial this case might not now be before us. We cannot properly take account of these documents in connection ▉ with this appeal because we are bound to review the law officer's ruling on the basis of the evidence in the record of trial and because the accused has not had the opportunity to challenge their admissibility or their content. Cf. United States v Hurt, 9 USCMA 735, 751, 27 CMR 3.[2]

Military criminal law and civilian criminal law have constitutional differences and constitutional identities. For example, a constitutional difference exists in the form of initiation of a prosecution in that the Consti-

exemplars is irrelevant is by reason of a number of recent Supreme Court decisions, that is, Supreme Court of the United States decisions. Gilbert versus California was one. There the court held that the privilege against self-incrimination incorporated within the Fifth Amendment of the United States did not include within its cover the executing of handwriting exemplars. . . . Now concededly the military rule is different, in that the Military Court of Appeals has ruled that the Article 31 is broader than the Fifth Amendment and therefore encompasses within its protections the execution of handwriting exemplars, but obviously Article 31 is applicable only to those who are within the ambit of the Code, or those who are operating at the direction of those who are within the ambit of the Code. Since this be the case, and since it is ostensible certainly by this time with this witness's testimony that he was conducting an independent investigation, one which he was bound by law to conduct, one which was not under the control of the military, one which was not subject to the whims of anyone under the Code, and since it is osten-sible that the witness is not within the ambit of the Code himself, of the two positions it is obviously the position of the United States Supreme Court which governs in these proceedings, hence it is irrelevant whether the individual was advised of his rights. As a matter of fact, there probably would be testimony as to advice, but the question is irrelevant. It simply does not matter. You can order a man to produce handwriting exemplars, you can direct him to produce them, so to advise him that he may remain silent is irrelevant, that anything he says may be held against him is irrelevant, that he may have counsel present or that he may have appointed counsel matters not."

[2] Since the sufficiency of the advice would present a different issue, we think it more appropriate to reach the merits of the appeal rather than return the record of trial for consideration of the limited question of whether the accused was advised of his right to remain silent and his right to counsel during interrogation by Agent Primrose. Cf. United States v DuBay, 17 USCMA 147, 37 CMR 411.

tution expressly exempts the armed forces from the Fifth Amendment requirement of indictment or presentment of a Grand Jury; constitutional identity exists in the right of an accused to confrontation and cross-examination of adverse witnesses at trial. United States v Jacoby, 11 USCMA 428, 29 CMR 244. To the extent a particular procedure or right is determined by the Supreme Court of the United States to be constitutionally mandated, this Court is bound by that determination since the Supreme Court is the highest tribunal in the Federal judicial hierarchy. United States v Whisenhant, 17 USCMA 117, 37 CMR 381; United States v White, 17 USCMA 211, 38 CMR 9. However, when a constitutional issue is not present, this Court may construe and apply the Uniform Code of Military Justice, without such limitations as may be remarked by other judicial authorities. United States v Smith, 13 USCMA 105, 32 CMR 105; United States v Simpson, 10 USCMA 229, 27 CMR 303. See also Quinn, "Some Comparisons Between Courts-Martial and Civilian Practice," 15 UCLA Law Review 1240 (1968). Police procurement of a sample of handwriting from an accused has been differently viewed by this Court and the Supreme Court of the United States.

In Gilbert v California, 388 US 263, 18 L Ed 2d 1178, 87 S Ct 1951 (1967), and United States v Wade, 388 US 218, 18 L Ed 2d 1149, 87 S Ct 1926 (1967), the Supreme Court of the United States held that a police officer may direct an accused to provide samples of handwriting, without infringing upon the accused's constitutional right against self-incrimination. In the Supreme Court's contemplation a handwriting exemplar is merely an "identifying physical characteristic" which, like a fingerprint, can be taken from the accused without preliminary advice that he has the right to refuse to provide the exemplar. Gilbert v California, supra, 388 US, at page 267. On the other hand, this Court has held that, under Article 31 of the Uniform Code of Military Justice, 10 USC § 831, a sample of handwriting obtained from an accused is inadmissible in evidence against him, unless he was first advised of his right to do and say nothing. United States v Minnifield, 9 USCMA 373, 26 CMR 153; United States v Rosato, 3 USCMA 143, 11 CMR 143. After *Gilbert* and *Wade* were decided by the Supreme Court, we reaffirmed our previous determination as to the meaning of the precepts of Article 31 and reaffirmed our conclusion that the Article required the exclusion from evidence of handwriting exemplars obtained from an accused when he was not preliminarily informed of his rights. United States v White, 17 USCMA 211, 38 CMR 9.

Not every kind of criminal investigator is subject to Article 31. The language of the Article directly limits its application to persons "subject" to the Uniform Code.[3] As a result, military investigators, acting independently in what can be described as an exclusive military investigation, must provide the threshold advice required by Article 31 before asking the accused for a sample of his handwriting, but civilian investigators, acting entirely independent of military authority, need not, as persons not subject to the Code, preliminarily advise

[3] In pertinent part, Article 31, Uniform Code of Military Justice, 10 USC § 831, reads as follows:

"(b) No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

. . . . . .

"(d) No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial."

an accused of his rights under Article 31. United States v D'Arco, 16 USCMA 213, 36 CMR 369. Between these polar situations are instances in which military and civilian authorities cooperate in the investigation of crimes of interest to one or the other or to both. Article 31 does not bar or discourage such cooperation; neither does it authorize violation of its provisions in the interest of cooperation. Consequently, when mili- █ tary and civilian enforcement agencies cooperate in an investigation, the military investigator, as a person subject to the Code, remains bound by Article 31. United States v King, 14 USCMA 227, 34 CMR 7. But what of the civilian investigator? Does he, as a person not subject to the Code, remain as fixedly outside the ambit of the Article as if the investigation were exclusively civilian in conduct and purpose? We have held that he does not; that he, too, is required to conform to the requirements of Article 31 if evidence he obtains from the accused is to be admissible in a court-martial against the accused.

Our cases identify at least two situations in which Article 31 extends to the civilian investiga- █ tor. These are: (1) When the scope and character of the cooperative efforts demonstrate "that the two investigations merged into an indivisible entity," United States v Swift, 17 USCMA 227, 232, 38 CMR 25; and (2) when the civilian investigator acts "in furtherance of any military investigation, or in any sense as an instrument of the military," United States v Grisham, 4 USCMA 694, 697, 16 CMR 268; United States v Aau, 12 USCMA 332, 30 CMR 332; cf. United States v Holder, 10 USCMA 448, 28 CMR 14. Where the evidence presents a question of fact as to the continued independence of the civilian and military investigations that question is determinable by the court members, under appropriate instructions as to the effect of a failure to comply with Article 31. United States v Plante, 13 USCMA 266, 271–272, 32 CMR 266; United States v Murphy, 14 USCMA 535, 34 CMR 315. Cf. United States v Dicario, 8 USCMA 353, 24 CMR 163. With these principles in mind, we turn to the evidence.

As noted earlier, Secret Service Agent Primrose testified he asked OSI Agent Lohmeier for "assistance" in the investigation he was conducting into the forgery of United States Treasury checks. According to his testimony, he asked for assistance "in the apprehension [and search] of individuals who drove the car" in the Bank of Tacoma incident. Lohmeier was unavailable as a witness, but OSI Agent Mazurkiewicz, his superior officer, testified to the nature of the investigation by the military. Mazurkiewicz said Lohmeier told him of Primrose's request and that Primrose had provided a description of the man involved in the incident, as related by a teller of the bank, together with information about the check, including the name of Hoyer as the purported endorser. Primrose also gave Lohmeier the license number of the car used by the person who presented the check, and Lohmeier ascertained from the records at the Air Police office that the car was registered in Pinckney's name. Sometime during the afternoon of May 9, Lohmeier and Mazurkiewicz "consulted" with the base Staff Judge Advocate. About 10:30 that night they went to Colonel Gene C. Willms, the Base Commander, apprised him of the reported attempt to cash the stolen check, and obtained written authorization to search Pinckney's vehicle for Treasury checks not in his name and for military identification issued to Hoyer. Shortly thereafter, and before execution of the search authorization, the agents questioned Pinckney. Advised of his rights under Article 31, Pinckney told them that he, his superior, a Sergeant Ruffin, and the accused were the only persons who had used his car on May 9. Ruffin was also "interview[ed]." About 1:30 a.m., the accused was called to the Air Police office, from his place of duty on the flight line, to be questioned by Lohmeier and Mazurkiewicz. Although disputed by accused at trial, there is ample evi-

199

dence to demonstrate that he was properly advised of his right to remain silent and right to counsel at the interrogation. He admitted to the agents that he had used Pinckney's car on May 9, and that he had tried to cash the Hill check at the Bank of Tacoma. He maintained he had received this check, with a military identification card, from a man known to him only as Bill; he had met Bill at a gas station, and Bill had asked him to cash the check. He denied he had altered the face amount of the check. The accused also admitted possession of several other Government checks, but insisted he had found these at a place known as Fox Island. He said he had disposed of some of these checks at the air base by "depositing them in various mail boxes." He denied he had stolen or altered any of them.

The questioning of the accused lasted about fifteen minutes. The agents then left the office to search Pinckney's car. In the glove compartment, they discovered five Treasury checks, one of which was the Hill check that the accused had tried to cash at the Bank of Tacoma. The agents returned to the Air Police office and called the accused's squadron commander, Colonel Roy S. Walser. When he arrived at the office, they informed him of the results of the investigation, including Pinckney's statements and the accused's admissions, and obtained authority to search the accused's room. Accompanied by Colonel Walser, the agents, the accused, and other security personnel, proceeded to the accused's dormitory. Before going to the accused's room, the accused asked to speak to Lohmeier and Mazurkiewicz "away from his squadron commander." They stepped aside, and Mazurkiewicz reminded the accused of his rights under Article 31. The accused informed them "there would be some items found in his wall locker that he found at Fox Island." Agent Mazurkiewicz told the accused to say nothing more, and "just, honestly, walked away." The accused's room was searched. A number of identification cards in the name of Hoyer and Welling were found in his

**290**

locker. Apparently, Colonel Walser authorized the accused's overnight detention in a cell at the security headquarters, "pending . . . interview" by the Secret Service in the morning, It was then about 5:00 a.m., May 10.

Sometime during the morning of May 10, Agent Primrose was informed by an OSI agent that the accused was "in custody." About 11:00 a.m., the accused was awakened and taken from the detention cell at the Air Police offices to be interviewed by Primrose. The record of the Article 32 investigation indicates the accused was advised by Agent Primrose of his right to remain silent and his right to counsel, and that no military persons were present during this interview, but none of this evidence was introduced at the trial. Pursuant to Primrose's request the accused composed two exemplars of his handwriting on forms used by the Secret Service. On the same day, Mazurkiewicz turned over to Primrose the five checks discovered in the glove compartment of Pinckney's car; he also gave Primrose the identification card in Hoyer's name which had been discovered in the accused's wall locker, but retained the identification cards in Welling's name, which had also been found in the locker.

From the accused's testimony, it appears that subsequent to the interview with Primrose, he was released without "any kind of restriction." According to Primrose, he decided not to take the accused, and Pinckney, who still was a suspect, into custody because he believed they "would be available for trial" when required. On May 12, Primrose again met the accused and obtained a third handwriting exemplar. The place and circumstances of this meeting are not disclosed in the record of trial. These three exemplars, and two provided by Pinckney, were forwarded to a Treasury Department document analyst. On June 7, Primrose was informed by an Assistant United States Attorney that his office would not "take jurisdiction in this matter" because the crime "began on a military reservation," and involved "many other things" that were "strictly" military. By this time,

military charges were pending against the accused. On the same day, Primrose discussed the case with an officer in the office of the Staff Judge Advocate who, apparently, was in charge of the military proceedings. The next day, Primrose obtained another handwriting sample from the accused on a Secret Service form. Again, the record of trial does not indicate the place at, or the circumstances under which, the writing was made. On September 6, Primrose requested, and received, still another exemplar from the accused. About then, or several days earlier, Primrose asked the OSI to take the accused's fingerprints. These were taken by the Air Police at the base, and turned over to Primrose, who had them "forwarded . . . to Washington." On October 17, as requested by Primrose, the accused's palm prints were taken, and submitted to a Secret Service fingerprint specialist for examination.

Primrose testified that every action he took in the case was part of his "own independent investigation." He maintained that, notwithstanding concurrent investigation by any other agency, his investigation was required by the Treasury Department to "determine whether or not the payee was involved and whether or not he is entitled to the issuance of a duplicate check." A material part of his testimony on that point is as follows:

"Q Was there ever any question up until the day of this trial as to whether or not the individuals apprehended would be brought to trial in the civilian community or the military?

"A It was not known at the time we first talked to Penn until we discussed it, I believe it was on the 7th of June, that the United States Attorney finally declined prosecution in favor of the military, but we still did not relinquish our rights in the case. We are charged with the suppression of forgery and counterfeiting of any government obligation, and regardless of what the OSI does, we never relinquished our part of reporting to the Treasury on any check that may have been forged or may have been altered. And during the course of this, numerous other checks showed where your client was involved."

The independent nature of concurrent civilian and military investigations may be so apparent from the record as to make manifest the inapplicability of Article 31 to the civilian proceeding. United States v D'Arco, supra. Here, the chain of investigative events that led to the accused began with the Secret Service. The report of the attempt to cash a suspicious check at the Bank of Tacoma was made to the Secret Service, not to the military; and the Secret Service, not the military, determined that the check was one of those that had been stolen, and that the car used by the person presenting the check was owned by Pinckney, an airman at McChord. At this point, it was appropriate, and not at all unusual, for the Secret Service to request the assistance of the military in apprehending the suspects. The evidence in the record of trial demonstrates that every step taken by the military complied with military law. When the accused was questioned at the Air Police office, the military investigators fully informed him of his rights under the Constitution and the Uniform Code of Military Justice. When they desired to search the car and the accused's room, they obtained proper authorization, which specifically enumerated the objects of the search. These circumstances compellingly indicate that the military investigators believed their procedures had to comport with military law, not the legal requirements to which the Secret Service might be subject. As far as Primrose is concerned, his testimony leaves no doubt that his investigation was entirely a Secret Service matter in regard to which the military had "no control over . . . [his] actions" at "any point in the case." His conduct is equally indicative of the separate and independent nature of his investigation.

Testifying on the admissibility of

the statements he made to OSI agents in their interrogation of him, the accused contended they did not advise him he was suspected of attempting "to cash a bad check," but he acknowledged that in his first interview with Primrose, Primrose told him "what the story was" and explained "the whole situation" to him. This detailed explanation by Primrose suggests he was acutely and especially concerned with assuring himself that the accused understood the nature of the offenses that constituted the subject matter of the Secret Service investigation. Since it is fairly inferable that he knew about the accused's earlier interrogation by the OSI, his exposition of the "whole situation," to make the accused realize fully his suspected involvement in the forgery of Government checks, evinces an understanding by Primrose that he was conducting a Secret Service investigation according to Secret Service investigative procedures, rather than engaging in the continuation of a military investigation. It is also significant, we think, that, when collecting the evidence obtained by OSI agents, Primrose took only those items directly connected with offenses he was investigating, while the OSI retained those apparently connected with the theft reported to the Air Police.

On the basis of the evidence before him, the law officer had ample justification to conclude, as he did, that the Secret Service investigation was independent and separate from the military investigation. It follows that, under *Gilbert* and *Wade*, both supra, Primrose could direct the accused to provide handwriting exemplars, without first warning him of his right to remain silent. The exemplars, therefore, were properly admitted in evidence. United States v D'Arco, supra.

The decision of the board of review is affirmed.

Judges FERGUSON and DARDEN concur.