UNITED STATES, Appellee

v

J. C. GRAY, Corporal, U. S. Army, Appellant

6 USCMA 615, 20 CMR 331

616

*First Lieutenant Gene E. Overbeck* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Joseph L. Chalk* and *Captain Frank C. Stetson.*

*First Lieutenant Edward S. Nelson* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton, Captain Vernon M. Culpepper, First Lieutenant A. Kenneth Pye,* and *First Lieutenant Arnold I. Burns.*

### Opinion of the Court

ROBERT E. QUINN, Chief Judge:

Brought to trial on seven specifications alleging violations of the Uniform Code of Military Justice, the accused moved to dismiss three of them on the ground that they were minor wrongs improperly joined with major offenses. The motion was granted. The accused was acquitted of one of the remaining charges and found guilty of a violation of a general regulation (Charge II and its specification), assault with a dangerous weapon (Additional Charge I, specification 2), and escape from confinement (Additional Charge III and its specification). He was sentenced to a dishonorable discharge, total forfeitures, and confinement at hard labor for five years. The findings of guilty and the sentence were approved by the convening authority and affirmed by a board of review. We granted review to consider the legal correctness of the law officer's instructions in regard to Charge II and Additional Charge III.

Paragraph 7e, and related provisions, of Circular No. 48, dated February 26, 1954, Headquarters, United States Army Europe, prohibit military personnel assigned to units in Germany from operating motor vehicles within that country unless duly licensed by the command. The Circular also contains an annex which sets out an ordinance promulgated by the United States High Commissioner for Germany. This ordinance forbids the operation of a motor vehicle registered under the ordinance, or pursuant to regulations issued by United States Army Europe, without a license from that command, or a license valid in another zone. The specification of Charge II alleges that the accused violated "a lawful general regulation, to wit: Article 3, Section B, Annex B, Circular No. 48, Headquarters United States Army Europe . . . by wrongfully operating an automobile without an Operators licenses."

On the afternoon of September 29, 1954, in the town of Heilbronn, Germany, the accused was observed driving a Porsche automobile. He was stopped and placed "under apprehension." At the military police station, the accused was advised of his rights under Article 31, Uniform Code of Military Justice, 50 USC § 602. In the course of the ensuing interrogation, he produced a "stateside operator's license," but admitted that he had no other permit. This incident resulted in the charge of violating Circular 48.

Without objection by the accused, the court-martial took judicial notice of

**617**

Circular No. 48. An extract copy of its pertinent provisions, including Annex B, was admitted into evidence. In instructing on the elements of the offense, the law officer advised the court as follows:

"The court is advised that to find the accused guilty of the Specification and Charge it must be satisfied by legal and competent evidence beyond a reasonable doubt; First, that there was in effect the lawful general regulation as alleged; Second, that at the time and place and in the manner alleged, the accused violated the general regulation."

The accused contends that the instruction on Charge II is so vague and incomplete as to be tantamount to no instruction. In United States v Jett, 5 USCMA 476, 18 CMR 100, we considered the same kind of instruction. We held that it did not delineate the essential elements which were required to prove a violation of the regulation. The same deficiency is present here. The Circular actually contains two prohibitions. One is an absolute prohibition against driving without a license from United States Army Europe. This is directed, however, only to military personnel assigned to units stationed in Germany. The other prohibition is set out in Annex B and applies only to registered vehicles. This distinction was relied upon by defense counsel. He moved for a finding of not guilty on the ground that there was evidence indicating that the vehicle was unregistered. In opposing the motion, trial counsel said, "the Specification wouldn't have to say Article 3, Section B, Annex B. All it would have to say is violation of Circular No. 48. Now in the goodness of our hearts somebody has put in Article 3 . . . paragraph 3 specifically states in there . . . except as otherwise provided herein. Then you go down to 7e and you are instructed there, no person shall operate a motor vehicle. So we cannot contend that the accused has been misled by the placing of Annex B in the Specification. . . . In fact, it says, by wrongfully operating an automobile, not a registered automobile, without an operator's license. There-

fore the motion for a finding of not guilty has to be denied."

The discrepancy between the two provisions, however, is not so easily determined. Sinclair v United States, 265 Fed 991 (CA DC Cir) (1920); see also United States v Boone, 1 USCMA 381, 3 CMR 115. Nonetheless, the motion was denied summarily, without objection by any member of the court. No reasons were given. Since there is no indication of the law officer's adoption of trial counsel's argument for denial of the motion, that argument need not have been the basis for his ruling. See United States v Fair, 2 USCMA 521, 10 CMR 19. On the contrary, he may merely have believed that the evidence indicated that the car was registered but the accused did not have registration papers at the time of his apprehension. Whether the motion was correctly denied need not here be determined. Suffice it that the failure of the law officer to particularize the basis for his denial left the question suspended in mid-air. See: United States v Berry, 6 USCMA 609, 20 CMR 325. As a result, the court-martial was left to speculate on the elements of the offense. See United States v Landrum, 4 USCMA 707, 16 CMR 281. The findings of guilty as to Charge II are set aside.

Turning to Additional Charge III, the accused contends that the law officer again erred in failing to provide the court with a proper legal framework for its deliberations. When the defense had rested, it moved for a finding of not guilty on the charge of escape from confinement. The motion was predicated upon the ground that the confinement had been imposed in violation of a Memorandum by the Division Commander, Major General Booth. In pertinent part, the Memorandum reads as follows:

"HEADQUARTERS 9th INFANTRY DIVISION

APO 111 US ARMY

MEMORANDUM 25 June 1954
NUMBER 12

• • • • • • •

19. It is the policy of the Division Commander that confinement of personnel be kept to a minimum consist-

618

ent with the circumstances in each case.

20. No personnel will be placed in *pre-trial* confinement without prior approval of the Division SJA. Request for pre-trial confinement may be made by telephone . . . This is not intended to deprive commanders of the authority to confine personnel for *temporary protective custody* without prior clearance (confined for drunkenness, disorder, self-protection, etc., or by town police, not in excess of 24 hours, or until 0800 hours of the first work day following weekend or holiday)."

The accused was placed under physical restraint by Captain B. A. Flowers, his company commander. Captain Flowers testified that he did not have the prior approval of the division staff judge advocate. He further said that he had restrained the accused "to insure his presence for trial."

After hearing argument on both sides, the law officer denied the motion. A member of the court objected. Thereupon, the law officer instructed the court on the voting procedure to be followed by it in deciding the motion. The court retired into closed session. A few minutes later, the court reopened and the following colloquy took place:

"PRES: The court would like to get one matter clarified by the law officer prior to announcing the results of the motion made by the defense. It was the understanding by this court that the law officer's instructions to the court was that we would vote whether to sustain or deny the motion made by the defense counsel.

LO: That is correct.

PRES: Rather than any ruling made by the law officer. Is that correct?

LO: That is correct. You will either grant or deny his motion, one or the other.

CM: May I ask your opinion?

LO: I'm afraid you can't ask my opinion.

CM: Well, can I ask you for your interpretation of the Manual for Courts-Martial?

LO: I'm afraid not.

PRES: The results of the voting by the court in closed session resulted in the defense counsel's motion for a finding of not guilty in the case of Additional Charge III—the motion was denied."

Manifestly, the law officer did not follow sound trial practice. In United States v Williams, 5 USCMA 197, 17 CMR 197, Judge Latimer, speaking for the Court, said (page 204):

". . . However, if the court-martial members are to perform their task of objecting or not objecting to the ruling with some degree of intelligence, they should have some assistance from the law officer. We, therefore, believe that after the law officer announces his ruling and before he asks if there is any objection, he should give certain instructions to the court. While the Code is silent about his duty in that regard, the Manual prescribes that he may give the court members such instructions as will better enable them to understand the question they are to determine and the manner in which it is to be determined. To do so makes sense, as it is of little value to permit the court members to overturn his decision when they have been given no standards by which to measure his ruling."

The question remains, however, whether the omission constitutes reversible error. In their briefs and in oral argument, counsel for both sides have stressed the relation of General Booth's Memorandum to Captain Flower's authority to place the accused in confinement. The issue is highlighted by the fact that in his own testimony, the accused admitted that he was under physical restraint and that he released himself therefrom before he was properly set at liberty. Except as to the legality of his confinement, his testimony amounts to a judicial confession of guilt. See: United States v Jackson, 4 USCMA 294, 15 CMR 294. It is apparent, therefore, that the pivotal issue is whether the confinement was lawfully imposed.

Confinement "officially imposed is presumed to be legal." Manual for Courts-Martial, supra, paragraph ■ 174c. Any officer may order any enlisted man into confinement. Article 9, Uniform Code of Military Justice, 50 USC § 563; Manual for Courts-Martial, paragraph 21a(2). Accordingly, the Government contends that since the confinement was ordered by Captain Flowers, it was legal. The essence of its argument is contained in the following excerpt from its brief: "As Captain Flowers was an officer and consequently specifically empowered by the Manual to impose confinement upon appellant, the confinement imposed was lawful notwithstanding the memorandum. Surely, the power entrusted to Captain Flowers by the President through the Manual may not be taken away by any lesser person unless authorized by the President, even a Division Commander." This argument is untenable.

Imposition of restraint upon military personnel is regulated, in the first instance, by the Uniform Code, not the Manual for Courts-Martial. Article 9, Uniform Code of Military Justice, 50 USC § 563. The Manual's discussion of the subject is, in substance, a reiteration of the provisions of Article 9. See: Manual for Courts-Martial, supra, paragraph 21a(2). But neither the Code nor the Manual confers an inviolable authority upon officers. Although the hearings on the Uniform Code do not give a clear indication of the intent of Congress, normal military needs would present serious obstacles to a claim of unrestrained authority. This may be shown by a simple example.

Let us suppose that all officers of a command consistently order enlisted personnel into confinement, even when charged with the most minor infractions under the Uniform Code. After a time, the commanding general finds that his confinement facilities are overtaxed; that a disproportionate percentage of his personnel is diverted to matters incident to the administration and execution of the confinement orders; that substantial time and effort is required to procure the release of minor offenders; and that, in general, the

indiscriminate confinements ordered by his subordinate officers seriously interfere with the day-to-day functioning of the units of his command. Under the circumstances is the commander powerless to supervise his subordinates? Can he remedy the situation only by ordering the release of persons who have been improperly confined? See Manual, supra, paragraphs 20c and 22.

It cannot be denied that a commander has plenary power over his subordinate officers regarding command functions. In the ordinary course of his authority he can enlarge or restrict the powers of particular subordinates. No cogent reason appears for creating an exception to his power insofar as it relates to the restraint of enlisted personnel of his command. On the other hand, as the supposititious situation indicates, numerous reasons militate against the carving out of such an exception to his normal power.

Article 9 does not constitute a grant of unrestrainable authority. The power to impose restraint is in the form of a limitation rather than a positive grant. It would appear, therefore, that the purpose of the Article is to restrict the classes of persons which can order restraint rather than to confer a power which is free from normal command controls. In our opinion, a superior commander may, in the interest of efficient and effective command operation, curtail the power of subordinate officers to confine personnel of his command.

Here, Major General Booth announced a "policy" of keeping confinements to "a minimum." In ■ harmony with that policy he directed that the approval of his staff judge advocate be obtained as a condition precedent to the imposition of confinement. The Government argues that these provisions were not intended as an order because they appear in the form of a Memorandum. The form in which an order is issued does not determine its legal effect. What is important is that the words used amount to a "positive command." United States v Mitchell, 6 USCMA 579, 20 CMR 295; United States v Glaze, 3 USCMA 168, 11 CMR 168. Moreover, a writing should be construed according

to its language and its purpose. United States v Voorhees, 4 USCMA 509, 527–528, 16 CMR 83. Considering both the language and the purpose of the Memorandum, we conclude that it was intended as an order. Since Captain Flowers did not have the prior approval of the division staff judge advocate, he plainly acted in violation of General Booth's order. He had no authority to confine the accused, and the purported restraint was unlawful. The findings of guilty of Additional Charge III are set aside and the charge is dismissed.

The record of trial is returned to The Judge Advocate General. If practicable, he may order a rehearing of Charge II; otherwise, he may order that charge dismissed and refer the case to the board of review for reassessment of an appropriate sentence on Additional Charge I, specification 2.

LATIMER, Judge (concurring in the result):

I concur in the result.

I dissented in United States v Jett, 5 USCMA 476, 18 CMR 100, and allied cases, but they have fixed the law of the Court. For that reason I join with the Chief Judge in reversing the finding on the violation of Article 3, Section B, Annex B, Circular No. 48, Headquarters, United States Army Europe, dated February 26, 1954.

I concur with the holding that the provisions of Memorandum Number 12, June 25, 1954, Headquarters 9th Infantry Division, paragraph VI, rendered the confinement illegal.