UNITED STATES, Appellee

v

PERRY L. WHITE, Private, U. S. Army, Appellant

17 USCMA 211, 38 CMR 9

No. 19,928

August 18, 1967

*Captain Thomas D. Wise* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent, Captain Paul V. Melodia,* and *Captain Frank J. Martin, Jr.*

*Captain Salvatore A. Romano* argued the cause for Appellee, United States. With him on the brief were *Colonel Peter S. Wondolowski* and *Lieutenant Colonel David Rarick.*

## Opinion of the Court

QUINN, Chief Judge:

The accused stands convicted of three specifications of unauthorized absence, escape from confinement, and forgery of a check, in violation of Articles 86, 95, and 123, Uniform Code of Military Justice, 10 USC §§ 886, 895, and 923, respectively. On this appeal, he challenges the validity of the findings of guilty of the latter two offenses.

After his return from a period of unauthorized absence, the accused was confined in the post stockade at Fort Riley, Kansas. He, and several other inmates, escaped by crawling through a hole in a chain link fence. At trial, defense counsel moved for a finding of not guilty as to the escape charge on the ground the Government had failed to establish that the order of confinement was lawful. The motion was denied.

Article 9 of the Uniform Code, supra, 10 USC § 809, prescribes two general conditions for confinement of enlisted personnel. First, the order for confinement must be issued by a competent person, that is, one having authority to confine. United States v Gray, 6 USCMA 615, 20 CMR 331. Secondly, there must be probable cause for the confinement. Article 9(d), Code, supra; cf. United States v Haynes, 15 USCMA 122, 35 CMR 94. The order here was issued by Captain Ronald E. Bonds, commanding officer of the accused's unit. Extract copies of morning report entries signed by Captain Bonds indicate the accused had just returned from an unau-

212

thorized absence, and previously had committed two other offenses of the same kind. The order recited these offenses as the reason for confinement. It would, therefore, appear that the basic requirements for lawful confinement were satisfied. However, in the *Gray* case, we noted that the general authority conferred by Article 9 upon an officer to confine enlisted persons is subject to curtailment by his superior commander. There, the division commander promulgated a policy to keep confinement of division personnel " 'to a minimum.' " To effectuate the policy, he directed that, except for temporary custody for a period not exceeding twenty-four hours, no one could be placed into pretrial confinement " 'without prior approval of the Division SJA.' " *Id.*, pages 618, 619. We construed the directive as a condition precedent to the exercise by a subordinate commander of the right to confine enlisted personnel. We concluded that the accused's confinement, which had been ordered by his commanding officer, a subordinate of the division commander, was unlawful because he had not obtained the approval of the division staff judge advocate. For that reason, we set aside the accused's conviction of escape from confinement.

At the time the accused was confined, a Fort Riley Headquarters Regulation (Number 22–2, dated March 24, 1965) provided a policy similar to that in the *Gray* case. It directed that "[p]retrial confinement will be kept to a minimum and will be the exception rather than the rule." Various means were specified to effectuate the policy. In pertinent part these are as follows:

"c. Procedure to Confine. No member of this command shall be placed in pre-trial confinement without consultation by the confining officer with the Staff Judge Advocate or his representative. The Staff Judge Advocate or his representative may be reached during non-duty hours through the Staff Duty Officer of this headquarters. Confinement orders placing an individual in pre-trial confinement will include, on the re-

verse side, an affirmative statement of the foregoing, to include the name of the Staff Judge Advocate Officer consulted on such action.

"d. Requirements After Confinement. When an individual is placed in pre-trial confinement, action will be taken to prefer charges against him within 48 hours. If charges are not preferred within 48 hours, the individual will be released unless continued pre-trial confinement is authorized by the Staff Judge Advocate. The Commanding General has delegated to the Staff Judge Advocate the authority to direct the release of individuals from pre-trial confinement when there is undue delay in the preferring or processing of charges, or for other good cause. The Staff Judge Advocate will inform the Commanding General immediately of such action and the reasons therefor."

Captain Bonds' order does not contain an endorsement, as required by the regulation, to indicate he had previously consulted with the staff judge advocate. In the motion for a finding of not guilty, defense counsel argued that consultation, like the approval required in *Gray*, was a condition precedent to the exercise of authority by Captain Bonds. The law officer rejected the contention. He interpreted the consultative requirements of the regulation as merely establishing a procedure which did not in any way restrict the exercise of the general power to confine, which is possessed by an officer. He concluded that disregard of the procedural requirement did not invalidate the confinement. United States v Hangsleben, 8 USCMA 320, 24 CMR 130.

The caption of the subparagraph dealing with the consultative requirements does indeed suggest these are matters of procedure. However, the label does not necessarily determine the substantive nature of the limitation. For example, a general statute of limitations is regarded as procedural in nature, but when the period of limitations is made an inseparable part of

a substantive matter, it, too, may be substantive. See 16 Am Jur, Death, § 393. The mechanical act of endorsing the order of confinement to indicate the fact of consultation may perhaps be a matter of procedure. See United States v Allen, 5 USCMA 626, 635, 18 CMR 250. But the regulation leaves no doubt that consultation with the staff judge advocate was the fundamental means of enforcing the policy against pretrial confinement. The language of the regulation is as direct and positive as that of the directive in the *Gray* case, and its purpose is the same. In our opinion, it also operates as a restriction on the general right to confine.

The Manual for Courts-Martial, United States, 1951, paragraph 174c, indicates that confinement "officially imposed is presumed to be legal." The law officer relied upon this presumption to deny the defense motion for a finding of not guilty. While it may be doubted that a presumption may dispense with proof of compliance with a condition precedent to exercise of the power to confine, we need not decide the point. Cf. United States v Gohagen, 2 USCMA 175, 7 CMR 51. The evidence before the law officer was sufficient to offset the presumption. The regulation required endorsement of the order of confinement to indicate consultation had been had. No such endorsement appeared on the order; and the inference therefrom is that no consultation took place. The law officer established that Captain Bonds had been transferred to another command and was not available as a witness, but the staff judge advocate was still present at Fort Riley. There is an intimation by the law officer that he thought the accused had the responsibility to call the staff judge advocate as a witness. Certainly, the staff judge advocate should have been called to settle the question of consultation. The fact that he was not called cannot be held against the accused. The staff judge advocate was equally available to the Government. That circumstance precludes the inference that his testimony would have been unfavorable to the accused. Cf. Bisno v United States, 299

F2d 711 (CA9th Cir) (1961), certiorari denied, 370 US 952, 8 L ed 2d 818, 82 S Ct 1602 (1962). On the evidence, therefore, the Government did not establish that the confinement was lawful; and the law officer should have granted the motion for a finding of not guilty.

In his second assignment of error, the accused challenges the correctness of instructions dealing with samples of handwriting obtained from him by Criminal Investigations Detachment agents. These samples were obtained on two successive days. On the morning of November 15, 1965, the accused was interviewed by Agent Robert A. Roulier in the CID office at Fort Riley, Kansas. Assistant Investigator Edgar M. Pierce was also present but did not actively participate in the interview.

Preliminarily, Roulier informed the accused he was suspected of forgery and larceny, and advised him of his rights under Article 31, Code, supra, 10 USC § 831. He explained that in "simple terms" the Article meant the accused "did not have to do or say anything whatsoever," but if he did, what he said or did could be used against him in a court-martial. The accused expressed his understanding and indicated he had no objection to the interrogation. Roulier then told the accused he had received from the office of the Sheriff of Geary County, Kansas, a statement the accused had made to the Undersheriff on November 6, in which he implicated himself in the forged check charge.

Roulier asked the accused if he would again relate the circumstances under which he had obtained and cashed the check. The accused did so. He also identified a check which Roulier showed him as the one he had executed. The oral statement was reduced to writing and sworn to by the accused. "Directly" afterward, Roulier asked the accused if he would provide samples of his handwriting for transmission to the Fort Gordon Criminal Laboratory "for examination and comparison tests" by experts. The accused agreed and furnished two exemplars. In one, he wrote the name "Jack F. Ridel," the name

**214**

of the drawer of the check, eleven times; in the other, he wrote his own name nine times. The next morning, Agent Pierce talked to the accused in the CID office. He informed the accused Agent Roulier had asked him to obtain more samples of the accused's handwriting. He explained to the accused these would also be sent to Fort Gordon for examination by experts. Pierce testified he specifically told the accused "he did not have to make them, and that if he did they could be used against him" in a trial by court-martial. The accused completed three blank check forms with the same writing that appeared on the forged check including an endorsement, on the back of each form, of his own name as payee.

At trial, defense counsel objected to the admission in evidence of the accused's confession on the ground it was "coerced" by the previous confession to the civilian authorities. He also objected to admission of the handwriting exemplars on the ground they were obtained in violation of Article 31. The accused testified in support of the objections. Although he admitted he "understood" he did not have to say anything, he contended that when he saw his confession to the Sheriff on Roulier's desk, he "figured" Roulier "would mainly go by that statement" in the interview. Yet, he could not say "for sure" whether he "would have or would not have" given a statement to Roulier if he had not seen the earlier confession. As to the handwriting samples, he said nothing about those given to Roulier; but as to those requested by Pierce, he contended he did not remember hearing whether Pierce said these could be used in a court-martial. He admitted Pierce told him that Roulier had requested these samples for "the case that Mr. Roulier was working on" and that they would be sent to Fort Gordon for examination by experts. He further admitted he "voluntarily signed" the check forms, understanding that he "did not have to do this if they could be used against . . . [him] in a trial by court-martial."

All defense objections were overruled. The confession and the exemplars were admitted in evidence.[1] No special instructions were given the court members as to the effect of the law officer's ruling on the Roulier samples. As to the Pierce samples, the law officer instructed the court members his ruling merely placed the exhibits before them; and he advised them regarding their right to consider the exhibits. Defense counsel made no objection to the instructions and made no request for additions or modifications. Now, however, the accused contends the instructions were erroneous and prejudicial. In material part the instructions are as follows:

"Article 31 b of the code prohibits the interrogation of one suspected of, or accused of an offense by any person subject to the code who does not first inform him of the nature of the suspected offense, and his right not to make any statement concerning it.

"You are advised that the making of the pre-trial examplars here must be disregarded by you, unless you are satisfied, beyond a reasonable doubt, that this prohibition was not violated in this case. This is so, even though the failure to give a proper warning, when one was required, has nothing whatsoever to do with the accused's decision to make the exemplars.

"Article 31b is not complied with if the warning as given leaves the accused with the belief that he does not have an unqualified right to remain silent, and to put things more in focus here, in addition to, when I say 'to remain silent,' I mean, in addition to that, I mean to not do

---

[1] Chief Warrant Officer Douglas A. Caywood, a questioned document expert, testified he had examined the forged check and the handwriting exemplars. In his opinion, the writer of the exemplars was also the author of the check. He reviewed the reasons for his conclusion, noting in part that he "laid primary emphasis" on the handwriting samples obtained by Pierce, and "reduced" his consideration of the Roulier samples.

anything, that is, to make these writings, or an absolute right not to make these writings.

"So it is that, unless you are convinced beyond a reasonable doubt that he was left with this belief, you must find that the warning was inadequate, and you must hold his statement to be inadmissible, or these exemplars to be inadmissible.

"Article 31B provides that the accused must be informed of the nature of the offense of which he is suspected. The Article does not require that the precise charge which was ultimately brought against the man be· spelled out with any exactitude, but, it does require that he be informed at least of the general nature and the purpose of the investigation.

"Unless you find that under all the circumstances he was aware of the general nature and the purpose, prior to making these exemplars, you must find them inadmissible. Ordinarily, the failure specifically to warn a suspect that any statement, or in this case, any exemplar made by him may be used as evidence against him in a court-martial, will not make the statement inadmissible. However, if the failure to so warn him can reasonably be construed as causing him to believe that his act, or his exemplar would not be used against him, if taken, is inadmissible. Therefore, unless you are convinced beyond a reasonable doubt that under all the circumstances of the interrogation the failure to give specific advice does not lead him to believe that his exemplars would be used against him, you must hold them inadmissible."

Before we can consider the question raised by the accused, we are confronted with the effect of recent rulings by the Supreme Court of the United States on the propriety of obtaining samples of handwriting from an accused without previous warning as to his right against self-incrimination. In Gilbert v California, 388 US 263, 18 L ed 2d 1178, 1183, 87 S Ct 1951, 1953 (1967), the Supreme Court held that no constitutional question was involved

216

in obtaining handwriting samples from an accused in police custody. A majority of the Court reasoned that a "mere handwriting exemplar, in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside . . . [the] protection" of the Fifth and Sixth Amendments. The rationale indicates that an accused in police custody need not be preliminarily advised as to his constitutional rights when asked to provide a sample of his handwriting. This concept was advanced by Judge Brosman in this Court to support the view that Article 31 of the Uniform Code does not apply to a request by police officers of an accused that he provide samples of his handwriting. United States v Ball, 6 USCMA 100, 19 CMR 226. But the Court rejected this reasoning in United States v Minnifield, 9 USCMA 373, 379, 26 CMR 153. We there said: "So that there will be no misunderstanding as to the position this Court now takes, we specifically hold that an accused's handwriting exemplar is equated to a 'statement' as that term is found in Article 31." The *Gilbert* case raises the question whether we must disregard *Minnifield* and realign the military practice.

United States v Tempia, 16 USCMA 629, 37 CMR 249, observed that this Court must accept and apply decisions of the Supreme Court of the United States on constitutional questions. *Minnifield,* however, is not based on our interpretation of the Constitution. It is, instead, an interpretation of the rights Congress accorded an accused under the Uniform Code of Military Justice. In United States v Musguire, 9 USCMA 67, 68, 25 CMR 329, we pointed out that "Article 31 is wider in scope than the Fifth Amendment." We are not, therefore, dealing with a constitutional right, but with a statutory right. To our knowledge, the Supreme Court has never construed Article 31 contrary to the interpretation we accorded it in *Minnifield.* · Consequently, we adhere to *Minnifield,* and reaffirm the rule that an accused must be apprised of his rights under Article

31, before he can be asked for samples of his handwriting.

The record of trial demonstrates the accused was fully informed of his rights under Article 31 at the beginning of the interview with Agent Roulier. It also establishes he was advised he "did not have to do or say anything whatsoever." The advice was given about thirty to forty minutes before the accused was asked for samples of his handwriting. Throughout the interrogation no pressure or coercion of any kind was exerted by Roulier or Pierce and no inducements were offered, either as to the confession or the lists of names the accused gave Roulier. In his own testimony about the interrogation, the accused presented nothing which can be construed as coercion or improper influence on the part of Roulier or Pierce. Consequently, unless the confession was tainted in some other way and this taint, in turn, infected the exemplars, there was no issue for the court-martial's consideration as to compliance with the requirements of Article 31 and the voluntariness of the confession and the Roulier-requested exemplars. Appellate defense counsel recognize this circumstance in their brief. They maintain the law officer improperly failed "to include in his instructions . . . [a statement as to] the effect of the appellant's prior confession." Syllogistically the argument is sound, but there is no factual support for its premise that the accused's confession "was the product of an inadmissible confession given to civilian authorities."

Defense counsel did indeed contend that the confession to Roulier on November 15 was "coerced" by the November 6 statement the accused made to the Sheriff. Yet all the accused testified to was that he did not "know for sure" whether he "would have or would not have" given a statement to Roulier, if he had not seen his confession to the Sheriff on Roulier's desk. Even if we assume the accused's testimony can be stretched into a claim that he would not have made the statement and would not have given the requested exemplars to Roulier but for the presence of the earlier confession on Roulier's desk, there is still nothing reflecting unfavorably on the propriety of the confession to the Sheriff. See United States v D'Arco, 16 USCMA 213, 36 CMR 369. Nor does the accused's supposition that he would be questioned by Roulier "mainly" on the basis of the statement to the Sheriff cast suspicion on the circumstances under which the Sheriff obtained the statement. No hint of impropriety appears anywhere but in defense counsel's conclusory contention of coercion. Argument is not evidence. On the record, therefore, the Roulier-requested exemplars were properly admitted into evidence, without further instructions to the court members.

A somewhat different situation exists as to the exemplars given to Agent Pierce. It will be recalled these were requested by Pierce the morning after the interrogation by Roulier. If the accused was sufficiently advised of rights under Article 31 as to leave no factual issue for consideration by the court members under proper instructions by the law officer, examination of the challenged instructions is obviated. Pierce's testimony on the subject establishes full compliance with the warning requirements of Article 31, although not according to the standard formula.

In his own testimony, the accused's only disagreement with Pierce was whether Pierce had, as Pierce testified, informed him that the additional exemplars could be used against him in a court-martial. As to that, he merely contended that "as far as I can remember I didn't hear him say that when I signed the exemplars." Assuming a court-martial could infer from this equivocal testimony that Pierce, in fact, failed to inform the accused the second group of handwriting samples could also be used against him, the omission did not dilute or detract from the advice given by Roulier. Under the circumstances presented by the record, that advice is inseparable from the interlude with Pierce.

In Westover v United States, one

of the cases considered together with Miranda v Arizona, 384 US 436, 496, 16 L ed 2d 694, 86 S Ct 1602 (1966), the Supreme Court held that separate periods of inquiry can constitute a single continuous interrogation. There, the accused was questioned by Kansas City police authorities. Several hours later, he was interrogated by Federal Bureau of Investigation agents. This interrogation took place at the City police station. Considering whether the two interrogations were separate, the Supreme Court said:

". . . Although the two law enforcement authorities are legally distinct and the crimes for which they interrogated Westover were different, the impact on him was that of a continuous period of questioning. . . . Despite the fact that the FBI agents gave warning at the outset of their interview, from Westover's point of view the warnings came at the end of the interrogation process."

The circumstances in this case indicative of a single interrogation are even more compelling than ▪ in *Westover*. Pierce was present when Roulier advised the accused of his rights under Article 31; he was also present when the accused furnished the two lists of names as exemplars of his handwriting; the accused was brought to the same office in which he had made his statement and provided the first exemplars; he was informed by Pierce that he "had been requested by Mr. Roulier" to obtain other exemplars, which were to be sent to the same crime laboratory as the first exemplars; and that these exemplars were for the case on which Mr. Roulier was working. The accused's own testimony leaves no doubt that the "impact on him was that of a continuous period of questioning." *Westover*, supra, page 496. The following excerpt from his testimony indicates he also understood the exemplars could be used against him in a court-martial.

"Q [DC]: Was it your understanding that you did not have to do this if they could be used against you in a trial by court-martial?
"A: Yes, sir."

If, at the beginning of a period of interrogation, the accused is fully informed of, and understands, his rights under Article 31, he need not be separately advised, as to each "particular item of evidence," that anything he says or does in regard thereto may be used against him in a court-martial trial. *Ball*, supra, page 105, my separate opinion. This idea seems to be the basis of the law officer's instruction, if the word "statement" is understood as applying only to the exemplars given to Pierce. Whether the court members understood the instruction in this sense, however, need not give us pause. Considering, as the evidence commands, that Pierce's request for additional exemplars was an integral part of the interrogation initiated by Roulier, the instruction was unnecessary. Roulier had fully apprised the accused of his rights. Improper incidents may arise in the course of an interrogation to vitiate advice given at the beginning of the interview. United States v Green, 15 USCMA 300, 35 CMR 272. However, assuming Pierce failed to tell the accused the additional handwriting samples could be used against him, the failure did not induce the accused to believe these exemplars would not, in fact, be used against him. See United States v Cudd, 6 USCMA 630, 20 CMR 346. We have already noted that the accused admitted he understood he did not have to provide the exemplars.

In summary, the record of trial discloses no factual issue as to the accused's confession to Roulier or as to the exemplars of his handwriting that required consideration by the court-martial. Consequently, the instructions by the law officer were unnecessary. Any ambiguity or uncertainty of meaning in them cannot, therefore, be regarded as prejudicial to the accused. United States v Spivey, 8 USCMA 712, 25 CMR 216. The absence of harm is especially apparent when the ostensible factual issue defined by the instructions is judicially admitted by the accused. See United States v Tharp, 11 USCMA 467, 29 CMR 283.

The decision of the board of review as to Charge II and its specification is set aside and the charge is ordered dismissed. The sentence is set aside and the record of trial is returned to the board of review for reconsideration thereof, in the light of this opinion.

Judges FERGUSON and KILDAY concur.