UNITED STATES, Appellee

v

WILLIE LEWIS, Jr., Airman First Class,
U. S. Air Force, Appellant

18 USCMA 355, 40 CMR 67

*Major William H. Seckinger* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph E. Krysakowski* and *Colonel Bertram Jacobson*.

*Major James A. Johnson* argued the cause for Appellee, United States. With him on the brief was *Colonel James R. Thorn*.

## Opinion of the Court

DARDEN, Judge:

Appellate authorities have approved without change accused's conviction of four forgery specifications and one larceny specification, in violation of Articles 123 and 121, Uniform Code of Military Justice, 10 USC §§ 923 and 921, respectively. His sentence of a dishonorable discharge, total forfeitures, confinement at hard labor for two years, and reduction to the lowest enlisted grade also stands unchanged. Two issues—one assigned, the other specified—were briefed and argued before this court. Together, they concern the use in Lewis's court-martial of handwriting exemplars taken from him by agents of the Government. One asks if:

The board of review erred in their holding that handwriting exemplars taken from the accused by a Secret Service agent without adequate advice as to counsel, in the presence of an agent of the Office of Special Investigations, in a room provided by the Office of Special Investigations, with the accused having been ordered to appear, were admissible in evidence.

The other asks:

Whether the handwriting exemplars were admissible in light of accused's protests against giving them and indication he wished to terminate the interview.

The record shows that this accused took four Treasury checks from the mailboxes of named payees located in the Consolidated Mail Room, Number 2, Norton Air Force Base, California.

Except for one temporary duty voucher, these instruments were issued and mailed by the Base Finance Office to two servicemen in settlement of their regular military pay. After negotiation and subsequent dishonor of the instruments, the Treasury Department of the United States started investigating the offenses (18 USC § 3056). The Los Angeles office of the United States Secret Service was notified immediately.

It appears that two of the forged checks came to the attention of the Secret Service through normal Treasury Department channels but the remaining two came to their attention via the Office of Special Investigations at Norton, that office having apparently been contacted by the Base Exchange. The Exchange and a local branch of the Bank of California had accepted and cashed these four checks. After suspecting the accused, the Base OSI office informed the Secret Service. Arrangements were then made for Special Agent Sheaks of the Secret Service to interview Lewis.

On December 8, 1967, Agent Sheaks met the accused at the Norton OSI office. Informed of the theft, forgery, and negotiation of these checks, Lewis was read, and also given to read, a Department of Justice Warning and Consent to Speak form. It apprised him that he had to understand his rights before being questioned; that he had a right to remain silent; that anything said could be used against him in a court or other proceeding; that he had a right to talk to a lawyer before being questioned

and to have him present during questioning; that if he could not afford a lawyer one would be appointed; and that if he decided to answer he could stop at any time. The accused then signed the form indicating that he understood and waived these rights.

When asked if he had given the accused any further explanation, however, Agent Sheaks replied, "As far as the attorney was concerned, yes, I explained that. I said, 'If you want an attorney now, I have no provision to furnish you one. You are only entitled to a court appointed attorney at the time the matter should go to court.'" Lewis later executed handwriting exemplars in compliance with the agent's request.

Agent Sheaks testified further that he acted in behalf of the Treasury Department because the Secret Service has primary jurisdiction over the investigation of forged checks; that he was not under the direction or control of agents for the Air Force; that Agent Fritz of the OSI office was present during the interview but took no part in the taking of the exemplars; and that before other agencies could proceed with their own investigation of such matters, these agencies had to obtain Treasury authorization.

In addition, he related that no coercion was used in acquiring these exemplars but that after giving the first set, the accused hesitated fifteen or twenty seconds, making "a weak objection" about going further. The agent responded "'Oh, come on and go ahead.'" The accused hesitated perhaps five or ten seconds more and then picked up his pen and continued to write. Accused, according to Sheaks, made no positive statement that he wanted a lawyer or that he wanted to terminate the interview.

Agent Fritz of the OSI informed the court that Sheaks had conducted the interview of this accused. In so doing, Sheaks was not under the control of Fritz or any other agent of the Air Force. Continuing, Fritz said he had not requested Sheaks to conduct the investigation; the Secret Service has responsibility and control over Treasury checks that are forged, altered, or cashed. He contended, too, that the accused had not refused to give additional handwriting samples but that the accused only hesitated after providing the initial set of exemplars. He quoted the accused as saying, "'I don't think I want to give any more,'" but this wasn't "verbatim." At no time did the accused request a lawyer or say that he wanted to leave, according to Fritz.

Fritz went on to relate that his office had developed the accused as a suspect and in so doing had made the initial contact with the accused but then had called the Secret Service for the matter was under "their investigative jurisdiction."

Later, on December 29, 1967, Fritz had interviewed the accused at the request of the office of the staff judge advocate, who had reopened the case. He had done so after clearing his intention with the Secret Service. At the time of his interrogation, he gave the accused an Article 31 warning. Fritz had not done so on December 8 for then he "was just an observer" and "had no intentions of questioning him."

In contradiction of these witnesses, the accused related that he believed the initial investigation to be an OSI inquiry. Although Agent Sheaks did the actual questioning, Fritz "said some things." It was the understanding of the accused that he could have an attorney only at the time of trial. Lewis testified that he had not read the consent form but only had signed it. The accused stated that he had not wanted to give more exemplars but he was informed that he had to.

Appellate defense counsel declare that Lewis was given an inadequate warning of his rights. Agent Sheaks was in error with his "explanation" that accused was entitled to a court appointed attorney only at the time of trial. As an Article 31 warning the advice given accused was insufficient, because it did not include a statement that Lewis had a right to refuse to give exemplars.

**357**

Counsel for Lewis contend that clearly this was an investigation conducted· by two agencies, the Secret Service and the Office of Special Investigations; hence, the law officer passed over his responsibility by presenting the problem to the court as a factual issue.

Appellate defense counsel also argue that accused was frustrated in his attempt to invoke his rights not to give a second set of exemplars. The right to terminate the interrogation is indispensable if Article 31 is to have any efficacy, say counsel for Lewis.

Appellate Government counsel reply that *Miranda-Tempia*[1] warning requirements have no application to the obtaining of handwriting exemplars and consequently that under the circumstances of this case Lewis has no correlative right, either constitutionally or by statute, to preliminary advice regarding rights to counsel or rights to terminate the interview.

Assuming *Miranda-Tempia* requirements apply, however, counsel for the Government maintain that the second set of exemplars is admissible because the accused did not assert his right to remain silent before furnishing them. Instead, the record shows only a normal hesitancy. The Government's position is that any possible factual issue was presented to the court and resolved by the fact finders.

Problems normally associated with the interplay of military-civilian investigative

**Headnote 1** come somewhat more pronounced in a case—such as the one at hand—where handwriting exemplars play a part in the accumulation of evidence. The Supreme Court considers handwriting as an "identifying physical characteristic," as distinguished from the contents of a writing, and thus outside the protection of Fifth Amendment privileges. The taking of exemplars, said the Supreme Court in Gilbert v California, 388 US 263, 267, 18 L Ed 2d 1178, 87 S Ct 1951 (1967), was "not a 'critical' stage of the criminal proceedings entitling petitioner to the assistance of counsel." See also United States v Wade, 388 US 218, 18 L Ed 2d 1149, 87 S Ct 1926 (1967).

This Court, however, since United States v Rosato, 3 USCMA 143, 11 CMR 143; United States v Minnifield, 9 US CMA 373, 26 CMR 153; and United States v White, 17 USCMA 211, 38 CMR 9, requires "the exclusion from evidence of handwriting exemplars obtained from an accused when he . . . [is] not preliminarily informed of his rights." Cf. United States v Penn, 18 USCMA 194, 198, 39 CMR 194.

About the interrelationship of police agencies, Chief Judge Quinn, speaking for the majority in *Penn*, went on to say:

"Not every kind of criminal investigator is subject to Article 31. The language of the Article directly limits its application to persons 'subject' to the Uniform Code. As a result, military investigators, acting independently in what can be described as an exclusive military investigation, must provide the threshold advice required by Article 31 before asking the accused for a sample of his handwriting, but civilian investigators, acting entirely independent of military authority, need not, as persons not subject to the Code, preliminarily advise an accused of his rights under Article 31. United States v D'Arco, 16 USCMA 213, 36 CMR 369. Between these polar situations are instances in which military and civilian authorities cooperate in the investigation of crimes of interest to one or the other or to both. Article 31 does not bar or discourage such cooperation; neither does it authorize violation of its provisions in the interest of cooperation. Consequently, when military and civilian enforcement agencies cooperate in an investigation, the military investigator, as a person subject to the Code, remains bound by Article 31. United States v King, 14 USCMA 227, 34 CMR 7.

---

[1] Miranda v Arizona, 384 US 436, 16 L Ed 2d 694, 86 S Ct 1602 (1966); United States v Tempia, 16 USCMA 629, 37 CMR 249.

But what of the civilian investigator? Does he, as a person not subject to the Code, remain as fixedly outside the ambit of the Article as if the investigation were exclusively civilian in conduct and purpose? We have held that he does not; that he, too, is required to conform to the requirements of Article 31 if evidence he obtains from the accused is to be admissible in a court-martial against the accused.

"Our cases identify at least two situations in which Article 31 extends to the civilian investigator. These are: (1) When the scope and character of the cooperative efforts demonstrate 'that the two investigations merged into an indivisible entity,' United States v Swift, 17 USCMA 227, 232, 38 CMR 25; and (2) when the civilian investigator acts 'in furtherance of any military investigation, or in any sense as an instrument of the military.' United States v Grisham, 4 USCMA 694, 697, 16 CMR 268; United States v Aau, 12 USCMA 332, 30 CMR 332; cf. United States v Holder, 10 USCMA 448, 28 CMR 14. Where the evidence presents a question of fact as to the continued independence of the civilian and military investigations that question is determinable by the court members, under appropriate instructions as to the effect of a failure to comply with Article 31. United States v Plante, 13 USCMA 266, 271–272, 32 CMR 266; United States v Murphy, 14 USCMA 535, 34 CMR 315. Cf. United States v Dicario, 8 USCMA 353, 24 CMR 163." [Id., at page 198.]

In cases where exemplars are important evidence, a joint participation of Secret Service and military investigators could result in circumventing the rights that a person subject to the Code would enjoy if the investigation were purely a military one. If one were inclined to impute bad faith to both the Secret Service and military investigators, the Secret Service could take exemplars without any warning in a case like this, then relinquish jurisdiction to the armed forces, and later introduce the exemplars in evidence at the court-martial. In contrast, a military investigator must warn the accused that under Article 31 he is not required to furnish the exemplars and that if he does furnish them they may be used against him during a trial. To protect fully the rights of an accused and to avoid unnecessary controversy, the Secret Service and military investigative agencies should use extraordinary care to assure that their cooperation is clearly justifiable and that it does not invite suspicion of being a whipsaw that abridges the rights of the accused.

We again turn to the facts before us.

Regardless of which agency was conducting the interrogation of Lewis, the warning given him was adequate under the precedents of the Supreme Court and this Court. If one views the investigation as being controlled by the Secret Service, Gilbert v California, supra, is authority that "handwriting exemplars" are outside the scope of the Fifth Amendment's privilege against self-incrimination; consequently, the defect about availability of counsel in the warning given was harmless, as the entire warning was superfluous for the purpose of the exemplars.

If one views the investigation as being directed by the military officials, the warning given Lewis complies with Article 31; that it does not comply with *Tempia* is immaterial here, because *Tempia* only extended *Miranda's* constitutional warning requirements to military interrogations. Since *Gilbert* held that a *Miranda* warning was not a prerequisite to the taking of handwriting exemplars, in this instance there is nothing to be extended through *Tempia*. This conclusion is consistent with United States v White, United States v Minnifield, and United States v Rosato, all supra, because those cases construe statutory warning requirements (Article 31) about which no dispute exists here. From this analysis, we believe it is clear that

Article 31 retains full vigor. Cf. United States v Pearson, 17 USCMA 204, 37 CMR 468; United States v Wood, 17 USCMA 257, 38 CMR 55; United States v Stanley, 17 USCMA 384, 38 CMR 182; United States v McCauley, 17 USCMA 81, 37 CMR 345; United States v Hart, 17 USCMA 524, 38 CMR 322; United States v Westmore, 17 USCMA 406, 38 CMR 204; United States v Penn, supra; United States v Vogel, 17 USCMA 198, 37 CMR 462; United States v Holcomb, 18 USCMA 202, 39 CMR 202.

Except for Agent Sheaks's advice about the availability of counsel, the warning given this accused was otherwise sufficient. He was informed of the offenses of which he was suspected, that he had a right to remain silent, that anything divulged could be used against him, and that he had to understand the nature of his rights. In short, the advice given him is in accord with that required under Article 31 of the Code.[2]

The law officer in this case properly presented the question of voluntariness as a factual matter to be resolved by the court-martial. The court accordingly was advised that if they were satisfied beyond a reasonable doubt that the exemplars were not obtained during the course of an official military investigation, by a Secret Service agent acting in furtherance of a military investigation, or by that agent acting as an instrument of the military, they could consider the exemplars as evidence against the accused. The evidence on this issue was marshaled by the law officer for the court's consideration.

Conversely, he instructed the court that if they were not satisfied beyond a reasonable doubt that the Secret Service agent acted independently they could not consider the exemplars without resolving certain other differences. These the law officer also

highlighted. Included was his coverage specifically directed to the dispute over the purported "termination" by Lewis of the interview. Cf. Frazier v Cupp, — US —, decided April 22, 1969, 37 U. S. Law Week 4362.

We find, therefore, that the handwriting exemplars given by Lewis were admissible in evidence and that the board of review did not err in so holding. United States v Holcomb, supra.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (concurring in the result):

I concur only in the result reached in this case. I disassociate myself entirely from that portion of the principal opinion which holds that when handwriting exemplars are obtained during a military interrogation, the warning requirements as to an accused's right to counsel are not applicable and only Article 31, Uniform Code of Military Justice, 10 USC § 831, need be complied with. This is, in my view, an unwarranted bifurcation of the test laid down in United States v Tempia, 16 USCMA 629, 37 CMR 249, for the determination of whether a *statement* obtained from a military suspect was secured in violation of his constitutional right against self-incrimination.

Contrary to the holding of the Supreme Court in Gilbert v California, 388 US 263, 18 L Ed 2d 1178, 87 S Ct 1951 (1967), that since a handwriting exemplar, in contrast to the content of what was written, was an identifying physical characteristic it was outside the protection of the Fifth Amendment, we held that it was a *statement* within the meaning of Article 31, Code, supra, the military counterpart of the Fifth Amendment (United States v

---

[2] "(b) No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial."

White, 17 USCMA 211, 38 CMR 9; United States v Minnifield, 9 USCMA 373, 26 CMR 153), because of our previously stated view that "Article 31 is *wider in scope* than the Fifth Amendment." (Emphasis supplied.) United States v Musguire, 9 USCMA 67, 68, 25 CMR 329. Surely a statute that "is wider in scope" than the constitutional amendment it encompasses, includes within it *all*, not *less than*, the protection afforded under the particular amendment. The Constitution is the basic law of the land and many statutes have been enacted expanding the particular privileges of citizenship established by the Bill of Rights. Article 31 is one of these. As this Court stated in United States v Kemp, 13 USCMA 89, 97, 32 CMR 89:

"Congress adopted Article 31, Uniform Code of Military Justice, supra, for the express purpose of assuring to persons in the military service the *full protection against self-incrimination afforded by the Fifth Amendment to the Constitution of the United States.* Under the Fifth Amendment, a witness must explicitly claim his constitutional immunity or he will be considered to have waived it. Rogers v United States, 340 US 367, 95 L Ed 344, 71 S Ct 438 (1951); United States v Monia, 317 US 424, 87 L Ed 376, 63 S Ct 409 (1943). Fully conscious of the fact that a person in the military service might not know of his right to refuse to answer and thereby unwittingly waive such privilege, and of his unique position while under interrogation, Congress went much further than the Fifth Amendment." [Emphasis supplied.]

When, in *Tempia*, we adopted for the military the decision of the Supreme Court in Miranda v Arizona, 384 US 436, 16 L Ed 2d 694, 86 S Ct 1602 (1966), we specifically noted, at page 635, that in prescribing the formulae to be utilized in custodial interrogations, "the Court was laying down constitutional rules for criminal interrogation which are *part and parcel of the Fifth Amendment.*" (Emphasis supplied.) A *statement* obtained in violation of these rules is inadmissible.

Since in the military system, handwriting exemplars are in the nature of a statement (United States v White, supra), I believe that when they are obtained by virtue of a military interrogation, full advice, including the right to counsel, must be given. When the advice is not given or *is erroneous*, I would hold the exemplars inadmissible.

Like my brothers, I, too, am concerned with the possibility that cooperative investigations of this nature, between civilian agencies and the military, *could* result in depriving a military accused of his fundamental rights. This is particularly apparent in the verbal advice given to the accused by the Secret Service agent, relative to counsel. When queried as to whether he had amplified the advice contained on his printed form, he replied:

"As far as the attorney was concerned, yes, I explained that. I said, 'If you want an attorney now, I have no provision to furnish you one. *You are only entitled to a court appointed attorney at the time the matter should go to court.*'" [Emphasis supplied.]

I question whether this advice is correct even under Miranda v Arizona, supra, but I am certain that it is erroneous within the military system of justice. United States v Tempia, supra; United States v Hardy, 17 USCMA 100, 37 CMR 364. See also United States v McCauley, 17 USCMA 81, 37 CMR 345; United States v Pearson, 17 USCMA 204, 37 CMR 468; United States v Wood, 17 USCMA 257, 38 CMR 55; United States v Stanley, 17 USCMA 384, 38 CMR 182.

My brothers urge that the cooperating agencies use extraordinary care to insure that their joint efforts are clearly justifiable and that they do not invite suspicion of being a whipsaw that abridges the rights of the accused. I would go further than that and require affirmative action at the outset of the interrogation in order to remove all doubt. Since an interrogation of a suspected military offender, conducted under these circumstances, is custodial because of the unique relationship between the serviceman and

361

his superiors (United States v Tempia and United States v Hardy, both supra), I believe, in the interest of justice, he should be specifically informed of the civilian nature of the inquiry; that insofar as the military is concerned he is free to go if he chooses; and that such action will not be used against him. Advice of this nature would immediately establish that the inquiry is civilian, thus eliminating any later speculation thereon. The issue would then be clear and the law officer would be relieved from the need, in questionable cases, to submit the matter to the triers of fact. It would have the added value of eliminating a later claim by an accused, either at trial or on appellate review, that he was under the impression he was required to cooperate with the civilian investigator. This advice would likewise bear upon the question of the voluntariness of any statement obtained thereat.

In my opinion, this would not place an undue burden upon the civilian or military investigators. While there must, of necessity, be cooperation between the agencies of Government and the military—and this should be encouraged—they both serve the same sovereign, and the fact that each is interested in the investigation from the standpoint of a different statutory enactment, should be immaterial. They are not, or, at least, should not be in competition with each other. Primary investigative jurisdiction over violations of the United States Code is granted by the Congress to particular civilian agencies at the time of enactment. These offenses are triable in the Federal District courts. However, military personnel are also subject to trial and punishment for these same offenses, under the provisions of Article 134 of the Code, 10 USC § 934, and, for this reason, they may be tried in Federal District courts or by military courts-martial. In such circumstances, I believe that the special rights granted a serviceman by the same Congress which enacted both sets of laws should be strictly adhered to by both civilian and military investigators. I do not perceive that Congress intended otherwise.